Michael D. Meuti (CA 227939)
BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone: 628.600.2250
mmeuti@beneschlaw.com

David M. Hopkins (*Admitted Pro Hac Vice*)
BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216.363.4500
dhopkins@beneschlaw.com

Corena G. Larimer (CA 277188)
ANTI-DEFAMATION LEAGUE
40 Court Street, Suite #12
Boston, MA 02108
Telephone: 212.885.7700
clarimer@adl.org

James Pasch (*Admitted Pro Hac Vice*)
Brendan Hogan (*Admitted Pro Hac Vice*)
ANTI-DEFAMATION LEAGUE
605 Third Avenue
New York, NY 10158
Telephone: 212.885.7700
jpasch@adl.org
bhogan@adl.org

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| MICHAEL RADICE<br><br>       Plaintiff,<br><br>              vs.<br><br>JERUSALEM BOXING CLUB, LLC; NATIVE GROUNDS, INC.; ABDULRAHIM HARARA; DOES 1–20<br><br>       Defendants. | Case No. 4:25-cv-02060-DMR<br><br><br>Magistrate Judge Donna M. Ryu |

**FIRST AMENDED COMPLAINT**

Plaintiff Michael Radice alleges the following facts in support of his First Amended Complaint against Defendants Jerusalem Boxing Club, LLC ("JBC"), Native Grounds, Inc., Abdulrahim Harara, and

1

Does 1–20 ("Does" and, collectively, "Defendants").

**NATURE OF THE ACTION**

1. This is an action to vindicate the rights of Michael Radice, who was unfairly and illegally discriminated against in visiting Defendants JBC's and Native Grounds's café, Jerusalem Coffee House ("JCH").

2. Once in July 2024 and once in August 2024, Mr. Radice visited Oakland in connection with his work as the interim executive director for a nonprofit organization. During those visits, he sought to secure the East Bay Community Space (the "Community Space") as a venue for a fundraiser event for that nonprofit organization. The Community Space's building houses JBC, Native Grounds, and JCH.

3. On both occasions, Mr. Radice was harassed and excluded from JCH (a place of public accommodation), explicitly because he is Jewish. On the second occasion, Mr. Radice was refused service and followed out of JCH and down the block. Accordingly, JBC and Native Grounds violated Mr. Radice's civil rights under both federal and California law.

**PARTIES**

4. Mr. Radice lives in Los Angeles, California.

5. JCH is, and at all relevant times was, a coffee shop that serves food and beverages to the public, operating at 5443 Telegraph Ave., Oakland, California.

6. JCH is, and at all relevant times was, a place of public accommodation within the meaning of 42 U.S.C. § 2000a(b)(2) that "affect[s] commerce" within the meaning of 42 U.S.C. § 2000a(c).

7. JBC is a limited liability company organized and existing under the laws of the State of California. Records filed with the California Secretary of State reflect that JBC's principal place of business is 5443 Telegraph Ave., Oakland, California.

8. A reasonable search of public business records yields no indication that JBC is a registered nonprofit entity.

9. Native Grounds is a for-profit corporation incorporated and existing under the laws of the State of California with its principal place of business at 5443 Telegraph Ave., Oakland, California—the same address where JCH operates and the same address as JBC's principal place of business. Records filed with the California Secretary of State indicate that Mr. Harara is the sole officer for Native Grounds,

fulfilling the positions of CEO, CFO, and Secretary. Those records also identify Mr. Harara as the sole director for Native Grounds and as its agent for service of process, and identify Native Grounds' "Type of Business" as a "coffee shop."

10. Upon information and belief, JBC and/or Native Grounds operate JCH. A reasonable search of California's public business records yielded no indication that JCH is a separate legal entity. And Alameda County's online records reflect that "Jerusalem Coffee House" is a fictitious business name (commonly called a "d/b/a") of JBC.

11. Harara is an individual domiciled in the State of California. Upon information and belief, Mr. Harara maintains a primary residence in Oakland, California.

12. Upon information and belief, Mr. Harara is the primary operator of JCH.

13. Records filed with the California Secretary of State identify Mr. Harara as JBC's CEO. Those records also identify Mr. Harara as the sole officer, sole director, CEO, CFO and Secretary of Native Grounds. Mr. Harara has also held himself out on videos available on social media as JCH's owner.

14. John Doe #1 is, upon information and belief, an individual domiciled and living in the State of California who works at JCH.

15. John Doe #2 is, upon information and belief, an individual domiciled and living in the State of California who works at JCH.

16. Does Nos. 3–20 are individuals involved in the incidents leading up to the filing of this action who are unidentified and unknown at this time but will be substituted upon the identification of those individuals.

## JURISDICTION AND VENUE

17. The Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1331 because this case involves alleged violations of federal civil-rights statutes and therefore involves a substantial federal question. Additionally, 42 U.S.C. § 2000a-6(a) confers subject-matter jurisdiction on this Court because this First Amended Complaint alleges a violation of a provision of U.S. Code Title 42, Chapter 21, Subchapter II—specifically, 42 U.S.C. § 2000a.

18. The Court has subject-matter jurisdiction over Plaintiff's state-law claims under 28 U.S.C.

§ 1367.

19. The Court has personal jurisdiction over all Defendants, as JBC, Native Grounds, and Harara are domiciled in this District, as are (upon information and belief) Does 1–20. Additionally, the Court has personal jurisdiction over all Defendants, as their actions leading to the filing of this case all took place within this District.

20. The Court has authority to issue the declaratory relief requested pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

21. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events giving rise to Mr. Radice's claims occurred in this District.

## FACTUAL BACKGROUND

## JEWISH IDENTITY AND ANTISEMITISM

22. Jewish identity is deeply important and personal to individuals in the Jewish community, whose members share not only a common religion, but also a common ancestry. This is evidenced both in direct genealogical descent and in collective descent from Jewish communities through the ages. Being Jewish is therefore an ethnic, community, and religious identity.[1]

23. Antisemitism is the hostility to or prejudice against Jewish people and/or Jewish identity. It has continually plagued the Jewish community for millennia.[2] Recent events abroad have triggered an explosion of antisemitic violence and harassment in many countries, including the United States.

24. On October 7, 2023, Hamas-led terrorists from Gaza invaded Israel and committed a massacre of innocent victims, in what became the deadliest day for Jewish people since the Holocaust. The terrorists murdered more than 1,200 people in cold blood, kidnapped more than 250 people, and tortured countless others as they ravaged and destroyed Jewish communities across Southern Israel. The attack seared into the minds of the Jewish community worldwide images of depravity, devastation of innocent victims, and vulnerability.

---

[1] Additionally, both the Supreme Court of the United States and the Ninth Circuit Court of Appeals recognize that 42 U.S.C. § 1981 covers claims for discrimination based on shared ancestry, such as Jewish ancestry. *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 612, 613 (1987); *Krain v. Kahn*, 1992 U.S. App. LEXIS 32411, *4 (9th Cir. 1992) ("The Supreme Court has held that Jewish ancestry is a race for purposes of § 1981").

[2] https://holocaustremembrance.com/resources/working-definition-antisemitism

25. During the ensuing war between Israel and Hamas, antisemitic incidents soared in the United States and around the world. Severe increases in antisemitism are common during periods of conflagration between Israel and its neighbors. After the October 7 attack, however, many countries including the United States saw unprecedented increases in anti-Jewish attacks and incidents. These incidents included assaults on Jewish individuals, vandalism of synagogues and other Jewish institutions, and as here, Jewish customers being denied service.

### MR. RADICE'S BACKGROUND

26. Mr. Radice grew up on a farm in the suburbs of Cleveland, Ohio. He attended college at Miami University.

27. In addition to his bachelor's degree from Miami University, Mr. Radice holds two master's degrees from Wright State University, a Ph.D. from The Union Institute and University, and a post-graduate certificate from New York University.

28. Mr. Radice has lived in multiple cities across the United States, including Cleveland, Ohio; Toledo, Ohio; New York City; and finally Los Angeles.

29. Mr. Radice is now a longtime resident of Los Angeles, California.

30. Mr. Radice is a proud Jewish man who occasionally wears apparel bearing insignia that clearly identify him as Jewish.

31. As part of his Jewish identity, Mr. Radice strongly believes in the principle of "Tikkun Olam," a Hebrew phrase representing the Jewish value of repairing the world. Tikkun Olam is a central part of Mr. Radice's relationship to his Jewish identity, as well as his relationship to the Jewish community.

32. Mr. Radice belongs to a Jewish congregation and attends services for the Jewish Sabbath almost every week. He also regularly volunteers at his synagogue and is involved in its LGBT and Jewish-convert groups.

33. Mr. Radice is currently employed full-time as the Interim Executive Director of a nonprofit organization located in Oakland, California that provides re-entry services for formerly incarcerated adults. He was placed there by an organization located in Seattle, Washington that places individuals into interim leadership positions with nonprofit organizations to help run those organizations.

34. He began his role with the Oakland nonprofit in October 2023 and currently holds that position.

35. In his role there, he supervises managers, focuses on long-term strategic issues, and provides general leadership of the organization as it works to fulfill its mission.

36. As part of that work, Mr. Radice travels to Oakland, California nearly weekly.

### THE FIRST ANTISEMITIC INCIDENT AT JCH

37. During one of those visits, on July 10, 2024, Mr. Radice traveled to the Community Space to evaluate it as a potential venue for a fundraiser for the Oakland nonprofit.

38. On that day, Mr. Radice wore a baseball cap with a Star of David icon and the phrase "Am Yisrael Chai" emblazoned on the cap in Hebrew.

39. The Star of David is a symbol that represents and is inextricably linked to Judaism and Jewish identity.

40. The phrase "Am Yisrael Chai" is a phrase used to signify solidarity with Jewish people and the Jewish community around the world, and simply means, "the people of Israel live."

41. Upon approaching the Community Space, he encountered a man—John Doe #1—sitting at a table outside JCH. Mr. Radice was not familiar with this man.

42. Without any introduction or pleasantries, the man asked Mr. Radice "Are you a Jew?" Mr. Radice responded in the affirmative.

43. The man then asked Mr. Radice "Are you a Zionist?" and proceeded to spew a series of accusations about Mr. Radice's Jewish identity, including accusing him of complicity in events taking place in the Gaza Strip following the October 7, 2023 Hamas terrorist attacks against Israel.

44. For example, the man accused Mr. Radice of being "responsible" for "killing children."[3]

45. The man made these remarks in a loud and angry voice.

46. Mr. Radice was concerned for his physical safety and turned to walk away to avoid

---

[3] These comments are suggestive of the longstanding antisemitic theory and propaganda tool of "blood libel." Specifically, blood libel is the myth that Jews murder non-Jews, especially non-Jewish children, in order to use their blood to perform religious rituals. Most prevalent in the medieval and early modern historical periods, this accusation has followed Jews around the world and incited violence against them for centuries.

inadvertently escalating the confrontation.

47. When he turned to leave, the man rose from his seat and said, "Where are you going?" and "Why are you afraid?"

48. As Mr. Radice walked away, another man—upon information and belief, Harara—came out of JCH and spoke to the first man, and the two went inside. Mr. Radice assumed the intervenor was a manager at the café.

## THE SECOND ANTISEMITIC INCIDENT AT JCH

49. Then, on August 3, 2024, Mr. Radice arrived early to the Community Space for its fundraiser event.

50. On that occasion, Mr. Radice stopped into JCH with the intent to purchase a cookie or other item as a token of appreciation for what he then believed was Harara's attempt to de-escalate the July 2024 incident.

51. Upon entering JCH and approaching the counter to make a purchase from the café, he noticed the two men from the July 2024 incident—John Doe #1 and Harara—working behind the counter. Mr. Radice did not notice any other customers in the café, but another worker, John Doe #2, was present.

52. Before Mr. Radice could place his order, one of the men from the July incident (John Doe #1) said "You're the guy with the hat. **You're the Jew. You're the Zionist. We don't want you in our coffee shop. Get out.**"

53. Then, Harara asked Mr. Radice if he intended to purchase anything.

54. Mr. Radice responded by explaining that he was simply in the café to make a purchase from them.

55. Then, one of the men told Mr. Radice again to "Get out," and pointed to the café door.

56. Mr. Radice then left the coffee house.

57. As he left, all three men—including Harara—followed him out of the café.

58. As he started walking north, away from the café entrance, he noticed that the three men were still following him.

59. Mr. Radice felt threatened due to the three men's pursuit.

60. He continued walking, attempting to escape his pursuers. As he did so, he heard the men

7

calling him things such as "Jew" and "Zionist."

61. Sensing that the men would likely not stop following him, and concerned for his safety, Mr. Radice walked into the street to create more distance between him and the three men.

62. The pursuit ended only when a board member of Mr. Radice's nonprofit organization arrived.

63. Despite the physical pursuit ending when the board member arrived, one of the men who was pursuing Mr. Radice remained at the street corner and shouted to the board member "That man entered our coffee shop and caused a disturbance."

## ANTISEMITISM AT JCH

64. Mr. Radice's experience is not the only demonstration of antisemitic animus at JCH. Events during the Fall of 2024 show that JCH's decision to deny service to Mr. Radice and to eject him from the café were not a result of a misunderstanding. Instead, they flow directly from JCH and Defendant Harara's decision to refuse to serve Jewish customers at the coffee shop and were part of a pattern of antisemitic discrimination.

65. Around the first anniversary of the October 7 Hamas terrorist attacks, JCH introduced new menu items, including drinks called "Iced In Tea Fada" and "Sweet Sinwar." JCH broadcast its menu featuring these new items on its Instagram page.[4] True and accurate reproductions of the menu JCH posted online are provided below.

---

[4] https://www.instagram.com/p/DA11FY_yDSF/?utm_source=ig_embed&ig_rid=e53db5fc-bba2-4642-9ea2-e633680df100&img_index=1



66. "Iced In Tea Fada" is a reference to intifada, an Arabic word translating to "uprising" or "shaking off." The term is commonly used to refer to periods of intense, and often violent, Palestinian protest against Israel. Indeed, the term is generally understood as a call for indiscriminate violence against Israel, and potentially against Jews and Jewish institutions nationwide. The Second Intifada, which lasted from approximately 2000 to 2005, included waves of suicide bombings on passenger buses and other civilian areas.

67. "Sweet Sinwar" appears to refer to the now-deceased Hamas leader Yahya Sinwar, a mastermind of the October 7 terrorist attack who was himself designated as a terrorist by the United States Department of State. Sinwar was the former Chairman of the Hamas Political Bureau and an ICC-alleged war criminal.

68. JCH's menu and building exterior also featured inverted red triangles, a symbol used to mark Israeli targets in propaganda videos promoted by Hamas's military wing, called the al-Qassam Brigades.

69. The inverted red triangle was historically used by the Nazi regime to identify political prisoners in their concentration camps, making its modern use particularly painful for Jewish communities.

70. Today, the inverted red triangle symbol has become associated with Hamas, and some protest groups in the United States use it to glorify violence against Israel.

71. Later that month, JCH further revealed its anti-Jewish animus when it ejected a different customer from the café on or about October 29, 2024, for wearing a blue hat featuring a white Star of David.

72. Video posted online shows Abdulrahim Harara confronting the customer, who appeared to be filming the video while sitting in the café with a young child.

73. In the video, Mr. Harara tells the customer, "Get out of my business. … This hat is a violent hat, and you need to leave!"[5]

74. The symbol on the hat to which Defendant Harara objected was a Star of David.

75. As the customer attempted to explain that Mr. Harara cannot kick someone out of the establishment because of the religious symbol on the hat, Mr. Harara responded, "Yeah, I can. It's my business."[6]

76. During the videotaped exchange, Mr. Harara exclaimed, "Are you a Zionist? Are you a Zionist? … Leave! Then get out!"[7]

77. Eventually, police responded to the scene and attempted to defuse the situation.

## COUNT I

## (Against All Defendants)

## (Violation of 42 U.S.C. § 2000a)

78. Mr. Radice incorporates by reference every paragraph of this Complaint as though fully set forth herein.

79. Mr. Radice is a member of a protected class by virtue of his religious, racial, and ethnic Jewish identity.

80. JCH is a place of public accommodation as specifically defined in 42 U.S.C. § 2000a, as JCH is a restaurant, café, and/or retail establishment that serves or offers to serve interstate travelers and/or

---

[5] https://jweekly.com/2024/11/05/second-confrontation-reported-at-oaklands-jerusalem-coffee-house/
[6] Id.
[7] Id.

that serves food or sells other products, a substantial portion of which have moved in commerce as defined in 42 U.S.C. § 2000a(c).

81. JCH is a place of public accommodation that is, upon information and belief, owned and operated by JBC and/or Native Grounds.

82. In attempting to purchase a cookie or other item from JCH, Mr. Radice attempted to contract for a good and avail himself of the full benefits and enjoyment of a place of public accommodation.

83. In refusing to serve Mr. Radice, or taking part in refusing to serve him, Defendants denied Mr. Radice the full benefits or enjoyment of a place of public accommodation.

84. Reasonable grounds exist to believe the Defendants will behave in a similar illegal fashion again. Those grounds include ejecting another customer because he is Jewish and other incidents of antisemitism at JCH as detailed above.

85. Upon information and belief, similarly situated persons who are not Jewish were able to avail themselves of the full benefits of JCH's services. Put differently, non-Jewish customers were able to order and receive food and beverages and consume them at JCH.

86. As 42 U.S.C. § 2000a-3 contemplates, Mr. Radice provided written notice to the California Civil Rights Department regarding the incidents detailed in this Complaint. That notice was delivered March 10, 2025.

87. Mr. Radice waited at least 30 days from delivery of that notice before filing this First Amended Complaint seeking relief under 42 U.S.C. § 2000a.

88. Under 42 U.S.C. § 2000a, Mr. Radice respectfully requests an order from this Court permanently enjoining all Defendants, their employees, agents and successors, and all others acting in concert or participating with them, from discriminating against or otherwise abridging the rights of Jewish individuals at JCH, including Mr. Radice.

**COUNT II**

**(Against All Defendants)**

**(Violation of 42 U.S.C. § 1981, et seq.)**

89. Mr. Radice incorporates by reference every paragraph of this Complaint as though fully

set forth herein.

90. Mr. Radice is a member of a protected class by virtue of his religious, racial, and ethnic Jewish identity.

91. JCH is a place of public accommodation that is owned by JBC and/or Native Grounds.

92. By harassing him and excluding him from JCH, Defendants demonstrated an intent to discriminate against Mr. Radice on the basis of race. Indeed, Defendants actually discriminated against Mr. Radice through these actions.

93. Mr. Radice entered JCH in an attempt to enter into a contract—specifically, a contract to purchase a cookie or other item in exchange for payment from Mr. Radice.

94. Making and enforcing a contract, including a contract to purchase goods, is a protected activity under 42 U.S.C. § 1981.

95. By discriminating against Mr. Radice and preventing him from making a contract on the basis of his ethnicity and race, Defendants infringed upon Mr. Radice's rights and violated 42 U.S.C. § 1981 as a result.

96. Mr. Radice has suffered damages as a result of Defendants' violation of 42 U.S.C. § 1981, in an amount to be determined at trial.

## COUNT III

### (Against All Defendants)

### (Violation of the Unruh Civil Rights Act — California Civil Code § 51, et seq.)

97. Mr. Radice incorporates by reference every paragraph of this Complaint as though fully set forth herein.

98. JBC and Native Grounds are business establishments organized under the laws of, and doing business in, the State of California.

99. JBC and/or Native Grounds are for-profit entities and business establishments, selling food, drink, and similar goods in exchange for currency.

100. Upon information and belief, Harara is the proprietor of JBC and Native Grounds, as well as the primary operator of JCH.

101. Upon information and belief, JBC and/or Native Grounds perform(s) all of the customary

business functions that give rise to associated obligations in a business–customer relationship.

102. Upon information and belief, Harara is the proprietor of JBC and Native Grounds, and the primary operator of JCH.

103. Specifically, Harara has held himself out on social media and other Internet-based sites as the proprietor of JCH.

104. In being discriminated against, denied service, and followed by Harara and Does 1-20 as he retreated from JCH, Mr. Radice was denied full and equal accommodations, advantages, facilities, privileges, and/or services of JBC; Native Grounds; and their café, JCH. Harara, the owner of JBC and Native Grounds and the operator of JCH, participated in and facilitated the discrimination, denial of services, and physical pursuit of Mr. Radice.

105. The aforementioned denial is based on at least one protected characteristic, specifically Mr. Radice's religious, racial, ethnic, and ancestral identities as a Jew.

106. Mr. Radice has suffered damages as a result of Defendants' violation of the Unruh Civil Rights Act, in an amount to be determined at trial.

## COUNT IV

### (Against Harara and Does 1-20 Only)

### (Violation of the Ralph Civil Rights Act — California Civil Code § 51.7, et seq.)

107. Mr. Radice incorporates by reference every paragraph of this Complaint as though fully set forth herein.

108. By excluding Mr. Radice and physically chasing him out of JCH, Harara and Does 1-20 threatened and/or committed a violent act against Mr. Radice.

109. A substantial motivating reason for their conduct was his perception of Mr. Radice's race, religion, and/or ancestry, specifically Mr. Radice's Jewish identity and ethnic background. These are protected characteristics under the Ralph Civil Rights Act.

110. Mr. Radice's Jewish identity was prominently presented and visible to Defendants by virtue of Mr. Radice's hat bearing a Star of David and the phrase "Am Yisrael Chai" in Hebrew, and they referred to him as "the Jew" when they followed him out of the coffee house.

111. Harara's and Does Nos. 1–20's conduct was a substantial factor in causing Mr. Radice's

harm.

112. Mr. Radice has suffered damages as a result of Defendants' violation of the Ralph Civil Act, in an amount to be determined at trial.

## COUNT V

### (Against All Defendants)

### (Declaratory Judgment)

113. Mr. Radice incorporates by reference every paragraph of this Complaint as though fully set forth herein.

114. An actual case or controversy has arisen between the parties.

115. Pursuant to 28 U.S.C. § 2201(a), et seq., Mr. Radice is entitled to a declaration that:

    a. All Defendants have violated Mr. Radice's civil rights under 42 U.S.C. § 2000a, et seq.;

    b. All Defendants have violated Mr. Radice's civil rights under 42 U.S.C. § 1981, et seq.;

    c. All Defendants have violated Mr. Radice's civil rights under the Unruh Civil Rights Act (California Civil Code § 51, et seq.); and

    d. Harara and Does 1–20 have violated Mr. Radice's civil rights under the Ralph Civil Rights Act (California Civil Code § 51.7, et seq.).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Radice respectfully requests that the Court enter judgment against Defendants and in favor of Mr. Radice as follows:

    a. Issuing an order permanently enjoining all Defendants, their employees, agents and successors, and all others acting in concert or participating with them, from discriminating against or otherwise abridging the rights of Jewish individuals at JCH, including Mr. Radice, on the basis of their religious, racial ethnic, and/or shared ancestral identities protected under 42 U.S.C. § 2000a et seq. and the Unruh Civil Rights Act (California Civil Code § 51, et seq.);

    b. Awarding Mr. Radice damages in an amount to be determined at trial for all Defendants' violation of Mr. Radice's civil rights under 42 U.S.C. § 1981, et seq.;

c. Awarding Mr. Radice statutory damages for Defendants' violation of Mr. Radice's civil rights under the Unruh Civil Rights Act (California Civil Code § 51, et seq.);

d. Awarding Mr. Radice damages in an amount to be determined at trial for Harara's and Does 1–20's violation of Mr. Radice's civil rights under the Ralph Civil Rights Act (California Civil Code § 51.7, et seq.); and

e. Declaring that:

    (i) All Defendants have violated Mr. Radice's civil rights under 42 U.S.C. § 2000a, et seq.;

    (ii) All Defendants have violated Mr. Radice's civil rights under 42 U.S.C. § 1981, et seq.;

    (iii) All Defendants have violated Mr. Radice's civil rights under the Unruh Civil Rights Act (California Civil Code § 51, et seq.); and

    (iv) Harara and Does 1–20 have violated Mr. Radice's civil rights under the Ralph Civil Rights Act (California Civil Code § 51.7, et seq.).

f. Awarding Mr. Radice reasonable attorneys' fees against all Defendants under 42 U.S.C. § 2000a, et seq.;

g. Awarding Mr. Radice reasonable attorneys' fees against all Defendants under 42 U.S.C. §§ 1981, 1988, et seq.;

h. Awarding Mr. Radice reasonable attorneys' fees against all Defendants under the Unruh Civil Rights Act (California Civil Code § 51, et seq.);

i. Awarding Mr. Radice reasonable attorneys' fees against Harara and Does 1–20 under the Ralph Civil Rights Act (California Civil Code § 51.7, et seq.);

j. Awarding Mr. Radice punitive damages against all Defendants under 42 U.S.C. §§ 1981 and 1988;

k. Awarding Mr. Radice punitive damages against all Defendants under the Unruh Civil Rights Act (California Civil Code § 51, et seq.);

l.  Awarding Mr. Radice punitive damages against Harara and Does 1–20 under the Ralph Civil Rights Act (California Civil Code § 51.7, et seq.);

m.  Such other and further relief as this Court may deem just, equitable, or appropriate.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Michael Radice demands a jury trial on all claims, counterclaims, defenses, and other issues so triable, by the maximum number of jurors permitted by law.

Dated: April 15, 2025

Respectfully submitted,

*/s/ Michael D. Meuti*
Michael D. Meuti (CA 227939)
BENESCH, FRIEDLANDER,
   COPLAN & ARONOFF LLP
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone:    628.600.2250
mmeuti@beneschlaw.com

David M. Hopkins (*Admitted Pro Hac Vice*)
BENESCH, FRIEDLANDER,
   COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone:    216.363.4500
dhopkins@beneschlaw.com

Corena G. Larimer (CA 277188)
ANTI-DEFAMATION LEAGUE
40 Court Street, Suite #12
Boston, MA 02108
Telephone: 212.885.7700
clarimer@adl.org

James Pasch (*Admitted Pro Hac Vice*)
Brendan Hogan (*Admitted Pro Hac Vice*)
ANTI-DEFAMATION LEAGUE
605 Third Avenue
New York, NY 10158
Telephone: 212.885.7700
jpasch@adl.org
bhogan@adl.org

*Attorneys for Plaintiff Michael Radice*