# Exhibit A
# Part 1 of 3

Michael D. Meuti (CA 227939)
David M. Hopkins (*Admitted Pro Hac Vice*)
BENESCH, FRIEDLANDER,
    COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216.363.4500
mmeuti@beneschlaw.com
dhopkins@beneschlaw.com

Corena G. Larimer (CA 277188)
ANTI-DEFAMATION LEAGUE
40 Court Street, Suite #12
Boston, MA 02108
Telephone: 212.885.7700
clarimer@adl.org

James Pasch (*Admitted Pro Hac Vice*)
Brendan Hogan (*Admitted Pro Hac Vice*)
ANTI-DEFAMATION LEAGUE
605 Third Avenue
New York, NY 10158
Telephone: 212.885.7700
jpasch@adl.org
bhogan@adl.org

*Attorneys for Plaintiff Michael Radice*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MICHAEL RADICE,<br><br>Plaintiff,<br><br>v.<br><br>JERUSALEM BOXING CLUB, LLC;<br>NATIVE GROUNDS, INC.;<br>ABDULRAHIM HARARA; DOES 1-20<br><br>Defendants. | Case No. 3:25-cv-02060<br><br>**PLAINTIFF'S MOTION TO COMPEL**<br><br>First Amended Complaint Filed: 04/15/2025 |

## I.    INTRODUCTION

In accordance with this Court's April 7, 2026 (Dkt. 99) Order, Plaintiff Michael Radice respectfully moves the Court to compel Defendants' compliance with their obligations to produce relevant, responsive ESI. Plaintiff's portion of the April 2, 2026 Joint Discovery Statement briefly

described how Defendants have shirked those obligations. But the strictures of the joint-discovery-dispute process precluded Plaintiff from offering evidence beyond the relevant discovery requests and responses, and it limited Plaintiff to just a few pages to present the scope of Defendants' misconduct. A fuller record of that misconduct makes clear that the Court's April 7, 2026 Order addressing the Joint Discovery Statement, although a step in the right direction, fails to fully rectify Defendants' discovery abuses. The Court has since granted Plaintiff permission to present a more-fulsome record through a motion to compel.

## II.    BACKGROUND

This case arises from a series of discriminatory incidents at Jerusalem Coffee House, a café operated by Defendant Jerusalem Boxing Club, LLC. Plaintiff Michael Radice, who is Jewish, was subjected to harassment on account of his Jewish heritage on July 10, 2024, and August 3, 2024. On the latter date, Radice was also denied service at the café. Another Jewish customer, Jonathan Hirsch, was harassed and ejected from the café because of his Jewish heritage on October 26, 2024.

Defendant Abdulrahim Harara is the sole owner of both Defendant Jerusalem Boxing Club, LLC and Defendant Native Grounds, LLC. He serves as the café's proprietor, and he is responsible for the café's day-to-day operations.

Relevant here, Plaintiff served discovery on Defendants seeking documents and communications: (1) concerning the incidents on July 10, August 3, and October 26, 2024; (2) reflecting other evidence of anti-Jewish animus, including relevant communications and social-media posts; and (3) concerning the café's finances and operations, including menu items that reflect anti-Jewish sentiments. As explained below, Defendants have refused to (a) preserve sources containing potentially responsive ESI, (b) conduct a reasonable search for responsive documents, and (c) produce responsive documents.

Beyond the meet-and-confer history detailed in prior filings (*see* Dkts. 88, 96), Plaintiff's counsel met and conferred with Defendants' new counsel on April 24, 2026, to address outstanding discovery disputes. The parties discussed a variety of issues, including (1) Defendants' deficient and unusable April 17 production, (2) Defendants' failure to properly preserve their data, (3) Defendants' procedurally and substantively deficient text message production, (4) Defendants' failure to produce responsive emails, and (5) Defendants' failure to produce responsive documents relating to their social media accounts. Attached

as Exhibit C is a true and accurate copy of Plaintiff's correspondence following the April 24 meet and confer that identifies Plaintiff's concerns in depth. To date, Defendants have not provided adequate assurances that their deficiencies would be timely addressed. Plaintiff was left with no choice but to file this Motion.

## III.    LEGAL STANDARD

Rule 37(a)(3)(b)(iv) authorizes a motion to compel where a party fails to produce documents requested under Rule 34. Federal Rule of Civil Procedure 34 grants a party the right to serve upon any other party a request to produce certain items in the "responding party's possession, custody, or control." Following service, the party served is obligated to respond in writing within 30 days by either "stat[ing] that inspection and related activities will be permitted as requested or… the grounds for objecting to the request." *Id.* As detailed below, Defendants have failed to properly preserve and search for various documents that Plaintiff requested in discovery, much less produce those documents.

## IV.    ARGUMENT

### A.    Defendants April 17 production is illegible.

On April 17, 2026, Defendants served a document production that purported to comply with the Court's April 7 Order. The production was not bates labeled, and Plaintiff could not discern how the produced documents related to previously produced discovery and thus how they complied with the April 7 Order. Accordingly, Plaintiff asked Defendants for clarification. Plaintiff's request was simple and reasonable: (1) re-produce what was sent on April 17 with Bates labels, and (2) insofar as the April 17 production is intended to update prior productions, provide a table of concordance reflecting the relationship between each page of the April 17 production and the relevant page(s) of the prior productions. *See* Ex. D. When the parties met and conferred on this issue on April 27, Defendants' new counsel stated that they could not explain what the April 17 production was or how it satisfied the Court's April 7 Order. (Meuti Decl. ¶ 10.)  Plaintiff is still waiting for that explanation.

Nor has Plaintiff received bates-stamped versions of the April 17 production. Plaintiff is left in the dark as to (1) what these documents are, (2) whether they comply with the Court's April 7 order, and (3) what, if any, relevancy they have to this case. Unless the Court orders Defendants to rectify their April

17 production, the production is essentially unusable, and Defendants are presumably not in compliance with the April 7 Order.

**B.      Defendants omitted text messages from the text threads they partially produced.**

Defendants' text-message production is deficient.  Harara produced only screenshots—not native files, not complete threads, but selectively cropped images showing isolated messages.  Harara himself decided which messages to include and which to omit.  At his deposition, he described his selection process: he ran keyword searches in his iMessage app, took screenshots of either the search results or portions of text threads, and deliberately omitted texts that Plaintiff's counsel "probably don't need."  Ex. B at 378:4-16.[1]

On at least one occasion, Harara went further, digitally scribbling over portions of a message to redact it before production.



Ex. 3 at DEFS0374.  He explained that he did so because he determined that Plaintiff is "not at liberty to see what's in that message."  Ex. B at 455:14-456:2.

As an initial matter, courts routinely hold that producing screenshots is incompatible with a party's production obligations.  *E.g.*, *Pso-Rite.com LLC v. Thrival LLC*, No. 1:21-cv-00775-PAB-STV, 2025 WL 3899841, at *2 (D. Colo. Dec. 23, 2025) (ordering forensic imaging of devices with discoverable text

---

[1] Exhibits A and B are excerpts of Harara's deposition transcript.  Numbered exhibits reflect the exhibit numbers used during the deposition.

messages after finding that "[p]roducing screenshots of text messages without sender, recipient, or date and time stamp information, or related metadata, is an impermissible 'document dump.'"); *Laub v. Horbaczewski*, 331 F.R.D. 516, 528 (C.D. Cal. 2019) (ordering production of "text messages either in … spreadsheet form … or, alternatively, in an otherwise mutually agreeable usable format that preserves the integrity of the threads of communication reflected in the text messages"); *see also id.* (collecting cases addressing text-message-production format). As the *Laub* court noted, "a party who responds to a discovery request by simply producing electronically stored information in a form of its choice, without first discussing the form with the requesting party, 'runs a risk that the requesting party can show that the produced form is not reasonably usable and that it is entitled to production of some or all of the information in an additional form.'" *Id.* at 527 (quoting Fed. R. Civ. P. 34 advisory committee's notes to 2006 amendment). Defendants' production is thus facially deficient.

But beyond the problems with the production format, the self-serving process that Defendants followed predictably excluded responsive communications. Consider the scope of Plaintiff's discovery requests. RFP 2 seeks "All Documents and Communications concerning [Harara's] interaction with Jonathan Hirsch on October 26, 2024." Dkt. 96-1 at 2. RFP 23 seeks "Documents and Communications containing information relevant to the claims and issues in this Action." Dkt. 96-1 at 6. These are not the only relevant requests, but they illustrate some of what Defendants were obligated to produce. As described below, comparing these straightforward requests to what Defendants actually produced underscores the magnitude of what they withheld.

The examples of Harara's selective production are numerous. DEFS0303–304 are screenshots of the results of a search that Harara ran in iManage. Rather than produce the actual text threads, he merely took screenshots of the search results. Ex. B at 363:20-368:1, 374:9-19, 377:11-17. Those search "hits" show that Harara forwarded a jweekly.com article about the Hirsch incident to at least seven people. But because he produced only screenshots of the search results, and not the actual text threads, he withheld all adjacent messages:

 

Any responses to those messages would be responsive to RFPs 2 and 23 at minimum (and likely to other requests as well). Messages preceding the link may also be responsive. But Harara chose to exclude them.

DEFS0310–311 tell a similar story. Those pages reflect screenshots of another iMessage search, with the text threads—and thus all adjacent messages to the texts that "hit" on the search term—withheld. *See* Ex. 2 at DEFS0310-11. They show that Harara sent at least six people a link to a *Jewish Telegraphic Agency* article about a menu item praising Hamas leader Yahya Sinwar.



Surrounding messages are almost certainly responsive to RFP 23 and to RFPs 7, 8, and 9, which seek documents concerning the café's menu. *See* Dkt. 96-1 at 3. Harara excluded them. *See also* Ex. 3 at DEFS0359. Similarly, DEFS0363 is a screenshot of a text Harara sent, forwarding a different article about the menu items. *Id.* at DEF0363. The recipient responded, "Are you gonna do something?" The screenshot cuts off there. Harara's response—almost certainly responsive to RFP 23—is missing because he chose to end the screenshot after that message.

These are far from isolated incidents. The record is replete with text messages produced as truncated search-term hit results, with surrounding messages in the threads omitted. Indeed, Harara testified that because he chose to take screenshots search of results, rather than of the text-conversation threads, at least 81 text messages were produced without any adjacent messages from the relevant threads. Ex. B at 377:19-392:8. The production is akin to receiving one message plucked from the middle of a lengthy email chain, with the related messages before and after cropped out.

Harara's production also contains texts that are simply incomplete. DEFS0325 is a screenshot of what appears to be a conversation with Jerusalem Coffee House's landlord, evidently in response to media attention generated by the Hirsch incident. Ex. 2 at DEFS0325.



The screenshot picks up mid-conversation, omitting the text that initiated the exchange. It also omits at least part of one of Harara's own messages. All those omitted communications are responsive to RFP 23. And DEFS0325 may omit further responsive messages; because Harara chose to produce screenshots and chose where to start and stop them, we simply cannot tell. (Notably, DEFS0325 references an email that the other party sent to Harara, evidently containing a video of the Hirsch incident. Harara produced neither the email nor the video.) DEFS0314 suffers from the same problem—the sole text message in that screenshot is cut short with ellipses at both the beginning and end. Ex. 2 at DEFS0314.[2]

In another example, DEFS0318 contains a text reading only "fuck the zionist." *Id.* at DEFS0318. Harara omitted any adjacent messages that would shed light on how that text relates to this case— including whether he was referring to one of the Jewish customers he refused to serve, and what else he may have said or been told.

Defendants may attempt to justify their approach, contending that they cropped out (or in the case

---

[2] Defendants' production also raises the specter that texts may have been deleted. For instance, DEFS0366 is a screenshot of a text thread between Harara and a friend Muhammad, who he described as "somebody [he] confide[s] in and ha[s] love for." Ex. B. at 464:18-20. In the screenshot, Harara tells Muhammad on April 4 that he was being sued—significant news. But the screenshot reflects no response from Muhammad for at least six months.

of DEFS0374, redacted) information that Harara unilaterally deemed was not relevant.  Courts frown upon that approach.  *Durling v. Papa John's Int'l, Inc.*, No. 16 Civ. 3592 (CS)(JCM), 2018 WL 557915, at *9 (S.D.N.Y. Jan. 24, 2018) ("redactions on grounds of non-responsiveness or irrelevance are generally impermissible") (citing *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) ("[Redactions of portions of a document are normally impermissible unless the redactions are based on a legal privilege.")); *Toyo Tire & Rubber Co., Ltd. v. CIA Wheel Grp.*, No. SA CV 15-00246-DOC (DFMx), 2016 WL 6246384, at *2 (C.D. Cal. Feb. 23, 2016) ("[the defendant] may not redact otherwise responsive documents because those documents contain irrelevant material"); *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, Nos. 08 md 1945(RJH)(DFE), 08 Civ. 0333(RJH)(DFE), 2009 WL 1026013, at *1 (S.D.N.Y. Apr. 8, 2009) (directing parties not to "redact any portion of a document on the ground that the portion is non-responsive and irrelevant" because such redactions "breed suspicions" and "may deprive the reader of context")).

The Court's Order does not remedy these deficiencies—it cements them in place.  The Order requires Harara only to add date, time, recipient, and sender information to the numerous screenshots from which he cropped out that information. *See* Ex. B at 462:9-19 (confirming that he cropped out a counterparty's identity).]  The Order is thus a step in the right direction.  But it does not reach any of the responsive text messages that Harara deliberately omitted from his production.  Unless the Court orders a more comprehensive remedy, those messages will remain hidden.

**C.     Harara failed to produce responsive emails.**

Harara claims that he searched his email and indeed produced emails.  Ex. B at 396:7-397:11 (concluding with "So I produced E-mails.").]  Yet Plaintiff has received none, which casts doubt on whether any search took place.  But if Harara did search his email accounts, whatever search he conducted was plainly inadequate.  Harara testified that JBC's business records "probably" exist in his email accounts. Ex. A at 147:2-13. He testified that the café's lease is "probably somewhere in [his] email." *Id.* at 119:3-16. That lease is squarely responsive to RFP 26, which Plaintiff served on JBC.  Ex. E at 26. Harara has not produced it.

The Court's Order requires Harara to produce all responsive emails or, if none exist, to declare

under penalty of perjury that he searched for responsive electronic materials and found nothing. Harara's declaration says that he has searched for responsive emails but has none. Dkt. 105 ¶ 6. That declaration is not credible. Harara's own testimony confirms that responsive documents exist in his email. A text screen shot that he produced confirms that he received responsive emails. *See* Ex. F at DEFS0325. The Court should order Harara to conduct a proper, verifiable search, overseen by his new counsel—or better yet, order a forensic preservation and examination of his email accounts to ensure that Plaintiff receives the documents to which he is entitled.

**D.    Defendants failed to produce social-media posts or guard against spoliation.**

Harara maintains multiple social-media accounts. Yet he produced virtually nothing from them—zero Twitter posts, zero Facebook posts, and perhaps four Instagram posts (though it is unclear whether those are even Instagram posts). Ex. G at DEFS0279–282. This is not a case where social media is tangential to the claims. RFP 11 specifically seeks "All Documents and Communications concerning any social-media posts by you." Harara's social-media accounts contain posts that are plainly responsive to that request and others. For example, Exhibit 48 is a publicly available post about the café's menu, containing an image of the menu. It is responsive to RFPs 7–9 and 23. Harara never produced it.



His failure to preserve his social-media accounts and to produce responsive documents from them are doubly concerning in light of the apparent spoliation that has already occurred. During a January 9,

2026 meet-and-confer, Defendants' then-counsel represented that Defendants' social media contained no relevant responsive documents. (Meuti Decl. ¶ 11.) Plaintiff's counsel asked whether it was really his position that Harara's Twitter feed did not contain a post reading: "Jonathan Hirsch is a genocidal, bottom dwelling Zionist scum and should be kicked out of every public establishment not just Palestinian owned ones!" (Meuti Decl. ¶ 12.) Of course, Harara's Twitter feed contained that exact post. Ex. 41. Defendants' counsel said he did not know but would ask his client. (Meuti Decl. ¶ 12.) Plaintiff's counsel responded that if counsel had been trusting his client without independently verifying what he was told, that approach was not working—and counsel was falling short of his professional obligations. (*Id.*)

The following week, the post disappeared from Harara's public Twitter feed. (Meuti Decl. ¶ 13.) Plaintiff's counsel preserved a copy of Harara's Twitter feed on January 15, 2026. (*Id.*) The "Zionist scum" post was gone. Ex. 39. Harara confirmed at his deposition that the post did not appear on his Twitter feed on that date. Ex. B at 409:2–410:1; *see also id.* at 401:2-24 (authenticating Ex. 39). Only after Plaintiff's counsel raised the evident spoliation with Defendants' then-counsel did the post reappear. (Meuti Decl. ¶ 14) It is unclear whether additional posts have been taken down.

Given this history, in the Joint Discovery Statement, Plaintiff asked the Court to order forensic preservation of Harara's social-media accounts and electronic devices. The Court declined. Instead, it ordered Harara to submit a declaration that he did not delete any social-media posts and would not do so in the future. Harara did so. Dkt. 105 ¶ 7. That remedy is inadequate in light of the evidence showing Defendants' disregard of their discovery obligations. A declaration from Harara—whose post vanished from Twitter days after Plaintiff's counsel flagged it—provides no meaningful protection against further spoliation. And it does nothing to address Harara's wholesale failure to produce responsive social-media posts in the first place.

## V.    CONCLUSION

This record shows that the Court's Order based upon the limited Joint Discovery Statement is not proportionate to the magnitude of those abuses. Stronger medicine is necessary. Specifically, the Court must order (1) a forensic preservation of Harara's electronic devices and social-media accounts, (2) a review of the preserved data by Defendants' new counsel to identify responsive, discoverable documents,

and (3) the production of these identified documents (including the missing documents and information identified above) in an appropriate format. Anything less than these measures will result in a trial conducted with an incomplete evidentiary record—an unacceptable outcome in any matter, much less in this case, where critical evidence has plainly been withheld.

Dated: May 8, 2026

Respectfully submitted,

/s/ *Michael D. Meuti*
MICHAEL D. MEUTI (CA 227939)
BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216-363-4500
mmeuti@beneschlaw.com

*Attorney for Plaintiff Michael Radice*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 8th day of May 2026, the foregoing document was served on Defendants' counsel of record through the Court's CM/ECF system.

Dated:  May 8, 2026                                            Respectfully submitted,


                                                               */s/ Michael D. Meuti*
                                                               MICHAEL D. MEUTI (CA 227939)
                                                               BENESCH, FRIEDLANDER,
                                                                   COPLAN & ARONOFF LLP
                                                               127 Public Square, Suite 4900
                                                               Cleveland, Ohio 44114
                                                               Telephone: 216-363-4500
                                                               mmeuti@beneschlaw.com


                                                               *Attorney for Plaintiff Michael Radice*

**PLAINTIFF'S MOTION TO COMPEL**
**Case No. 3:25-cv-02060**

# Exhibit A

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

_____
                                )
MICHAEL RADICE,                 )
                                )
            Plaintiff,          )
                                )
vs.                             )  No. 4:25-cv-02060
                                )
JERUSALEM BOXING CLUB, LLC;     )
NATIVE GROUNDS, INC.;           )
ABDULHARIM HARARA; DOES 1-20,   )
                                )
            Defendants.         )
_____)


        VIDEOTAPED DEPOSITION OF ABDULHARIM HARARA
                San Francisco, California
                Wednesday, March 25, 2026
                        Volume I


Reported by:
CATHERINE A. NOLASCO, RMR, CRR, BS
CSR No. 8239
Job No. MW 7976363

PAGES 1 - 76 and 81 - 334
PAGES 77 - 80 are bound in a separate transcript
marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER"

Page 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


_____
                                )
MICHAEL RADICE,                 )
                                )
          Plaintiff,            )
                                )
vs.                             )   No. 4:25-cv-02060
                                )
JERUSALEM BOXING CLUB, LLC;     )
NATIVE GROUNDS, INC.;           )
ABDULHARIM HARARA; DOES 1-20,   )
                                )
          Defendants.           )
_____)




          Videotaped deposition of ABDULHARIM HARARA, Volume I, taken on behalf of Plaintiff, with the Witness appearing at BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, 100 Pine Street, Suite 3100, San Francisco, California, beginning at 9:21 a.m. and ending at 6:13 p.m., on Wednesday, March 25, 2026, before CATHERINE A. NOLASCO, Certified Shorthand Reporter No. 8239.

Page 3

APPEARANCES:

For Plaintiff:
        BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
        BY:   MICHAEL D. MEUTI
        Attorney at Law
        100 Pine Street, Suite 3100
        San Francisco, California   94111
        628.600.2250
        mmeuti@beneschlaw.com
        BY:   DAVID M. HOPKINS (appearing remotely)
        Attorney at Law
        127 Public Square, Suite 4900
        Cleveland, Ohio   44114
        216.363.4500
        dhopkins@beneschlaw.com

        ANTI-DEFAMATION LEAGUE
        BY:   CORENA G. LARIMER
        Attorney at Law
        40 Court Street, Suite 12
        Boston, Massachusetts   02108
        212.885.7700
        clarimer@adl.org
        BY:   BRENDAN HOGAN
        Attorney at Law
        605 Third Avenue
        New York, New York   10158.
        212.885.7700
        bhogan@adl.org

For Defendant:
        KATON.LAW
        BY:   GLENN KATON
        Attorney at Law
        385 Grand Avenue, Suite 200
        Oakland, California   94610
        510.463.3350
        gkaton@katon.law
//

Page 4

APPEARANCES (Continued):

For the U.S. Department of Justice:
     CIVIL RIGHTS DIVISION
     BY:  MAZEN M. BASRAWI
     Attorney at Law
     950 Pennsylvania Avenue, NW
     Washington, DC  20530
     202.305.1876
     202.514.1116 Fax
     mazen.basrawi@usdoj.gov

For Non-Party Jonathan Hirsch:
     THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS
     UNDER LAW
     BY:  OMER WICZYK (appearing remotely)
     Attorney at Law
     1776 I Street, NW
     Washington, DC  20006
     202.559.9296

ALSO PRESENT:
YOHANNES EJIGU, Paralegal, U.S. Department of Justice

GWENDOLYNNE BEAUSSEJOUR, Paralegal Specialist, U.S. Department of Justice (appearing remotely)
NOOR HARARA (appearing remotely)
ASIAH HARARA (appearing remotely)
PETER YAROSCHUK, Videographer, Veritext

---o0o---

INDEX

WITNESS                                          EXAMINATION

ABDULHARIM HARARA

Volume I

                   BY MR. MEUTI                                10

EXHIBITS

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 1 | Photocopy of an image; 1 page | 92 |
| Exhibit 2 | Text transcription; Bates DEFS0299 – DEFS0347 | 97 |
| Exhibit 3 | Text transcription; Bates DEFS0348 – DEFS0375 | 98 |
| Exhibit 4 | "Page Vault" LinkedIn post; 3 pages | 112 |
| Exhibit 5 | Thumb drive | 131 |
| Exhibit 6 | Screenshots of payments; Bates DEFS0291 - DEFS0297 | 131 |

//

Page 6

EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 7 | "STATE OF CALIFORNIA Office of the Secretary of State STATEMENT OF INFORMATION CORPORATION"; Bates DEFS0149 - DEFS0150 | 145 |
| Exhibit 8 | Text transcription; Bates DEFS0284 - DEFS0290 | 150 |
| Exhibit 9 | Color photocopy of a photograph; 1 page | 151 |
| Exhibit 10 | Color photocopy of a screenshot; 1 page | 154 |
| Exhibit 11 | Color photocopy of a photograph; 1 page | 163 |
| Exhibit 12 | Color photocopy of a photograph; 1 page | 249 |
| Exhibit 13 | Hand drawing; 2 pages | 259 |

//

Page 7

                    EXHIBITS (Continued)

NUMBER                    DESCRIPTION                    PAGES

Exhibit 14  Color photocopy of photographs; 2        311
            pages


Exhibit 15  Color photocopy of a photograph; 1       325
            page



                INSTRUCTIONS NOT TO ANSWER

                                                     PAGES

            "Q.  Why not?"                           179

            "Q.  Okay.  Aside from the issue of      243
            reporting it, for what reason did you
            not save that death threat to have
            evidence of your having received it?"



                        ---o0o---

Page 8

San Francisco, California; Wednesday, March 25, 2026

9:21 a.m.


THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:21 a.m. on March 25th, 2026.

Please note that microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.

Audio and the video recording will continue to take place unless all parties agree to go off the record.

This is Media No. 1 of the video-recorded deposition of Abdulrahim Harara, taken by counsel for Plaintiff in the matter of Michael Radice versus Jerusalem Boxing Club, LLC, et al., filed in the United States District Court for the Northern District of California, Case No. 425CV02060.

The location of this deposition is 100 Pine Street, Suite 3100, San Francisco, California.

My name is Peter Yaroschuk, representing Veritext.  I am the videographer.  I am not related to any party in this action, nor am I financially

the color of the two stripes to the top and bottom, correct?

A    Correct.

Q    Okay.  What jobs do you currently hold?

A    I don't have a job.

Q    Okay.  Would you describe yourself as a business owner?

A    I wouldn't, but some people would.

Q    Okay.  And what businesses do you own?

A    I own the Jerusalem Boxing Club.

Q    Okay.  Any others?

A    There's possibly a few.

MR. MEUTI:  Okay.  We'll come back to that.

I've handed to the court reporter what will be marked as Exhibit 2.

(Exhibit 2 was marked for identification by the court reporter.)

BY MR. MEUTI:

Q    Do you recognize Exhibit 2?

A    I just need a moment to look through it.

Q    As you're looking through, I'll represent to you that Exhibit 2 is a collection of screenshots of text messages produced to us in discovery and bearing the Bates numbers DEFS-299 to DEFS-347.

Do you have any reason to dispute that characterization?

A    No.

Q    Okay.  Did you take these screenshots of text messages from your iPhone?

A    Yes.

Q    And did you do so in response to discovery requests that we served in this case?

A    Yes.

Q    And in the screenshots, the blue or green bubbles represent texts that you sent, correct?

A    Correct.

(Exhibit 3 was marked for identification by the court reporter.)

BY MR. MEUTI:

Q    All right.  You should have now what has been marked as Exhibit 3.

Do you recognize Exhibit 3?

A    Yeah.

Q    Okay.  What is Exhibit 3?

A    More discovery.

Q    Okay.  Exhibit 3 is another collection of screenshots of text messages that bears the Bates range DEFS-348 to -375, correct?

A    Correct.

Page 99

Q    And on the first page, it's labeled "New Discovery," correct?

A    Correct.

Q    Okay.  Did you take the screenshots in Exhibit 3 from your iPhone?

A    Yeah.

Q    Did you do that in response to discovery that we served in this case?

A    I'm not sure how to answer that question.

Q    Okay.  In these texts, the blue or green bubbles represent texts that you sent, correct?

A    Correct.

Q    You mentioned a moment ago that you own Jerusalem Boxing Club and there might be others, correct?

A    Yeah, other businesses --

Q    Okay.

A    -- that I've opened up but are not operating, so they're not top of mind or a priority for me.

Q    Okay.  Aside from Jerusalem Boxing Club, can you name another business that you have opened up or created?

A    Jerusalem Coffeehouse.

Q    Okay.  Any others?

Q   It pays rent?

A   Yeah.

Q   Who is the lease with?

A   I don't have a copy of it, so I can't tell you off the top of my head.  I don't know if it's under the LLC or the guy's name.

Q   All right.  Is it with the entity that owns the East Bay Community Space?

A   Most likely.

Q   Okay.  Did you sign that lease?

A   Yeah.

Q   Okay.  You testified you do not have a copy of it, correct?

A   Right now, no, I don't.

Q   I mean, in general, if you --

A   Probably somewhere in my email.

Q   Okay.  About how much per month does JCH pay in rent?

A   Maybe 2400.

Q   Okay.  And how does it make those payments?  With a check?  In cash?  Venmo?

A   Zelle.

Q   The account from which the Zelle payments are made, is it a checking account?

A   Yes.

Page 147

BY MR. MEUTI:

Q    Any business records at all --

A    Yeah.

Q    -- for JBC?

A    I've got to go find them.

Q    Okay.  Do you have some in hard copy?

A    No.

Q    Okay.  Might some of them be on a computer hard drive?

A    No.

Q    Might some of them be on an external storage device, like a thumb drive?

A    No.  Probably in, like, an email.

Q    Okay.

A    I got an email from the State of California, or I got an email from, you know, whatever.

Q    Okay.  Might some of them be in cloud storage, like a DropBox or a Google Drive?

A    Not one that I manage.

Q    Okay.  Does JBC maintain a ledger of accounts?

A    No.

Q    Does JBC maintain employee files?

A    No.

# Exhibit B

Page 338

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

MICHAEL RADICE,

                Plaintiff,

                                    VOLUME 2

        Vs.                 Civil Action No. 25-cv-2060

JERUSALEM BOXING CLUB, LLC,

                Defendants.

_____/

UNITED STATES OF AMERICA,

                Plaintiff,

                Vs.           Case No. 3:25-cv-04849-SI

FATHI ABDULRAHIM HARARA and NATIVE
GROUNDS, LLC, d/b/a JERUSALEM
COFFEE HOUSE,

                Defendants.

_____/

--o0o--

FRIDAY, MARCH 27, 2026

--o0o--

VIDEOTAPED DEPOSITION

OF

ABDULRAHIM FATHI HARARA

--o0o--

Reported By:  CAROL S. NYGARD

              California CSR No. 4018

              Nevada CCR 915

   Job No. CS7980532

Page 339

APPEARANCES:

For the Plaintiff MICHAEL RADICE:

BENESCH LAW
BY:   MICHAEL E. MEUTI, ESQ.
       DAVID M. HOPKINS, ESQ. (Via Zoom)
127 Public Square
Suite 4900
Cleveland, Ohio  04414
216.363.6247
mmeuti@beneschlaw.com
dhopkins@beneschlaw.com

For Plaintiff, UNITED STATES OF AMERICA:
U.S. DEPARTMENT OF JUSTICE
BY:   MAZEN BASRAWI, ESQ.
       YOHANNES EJIGU, Paralegal
Housing and Civil Enforcement Section
Civil Rights Division
950 Pennsylvania Avenue NW - 4CON
Washington, DC  20530
202.305.5703
mazen.basrawi@usdoj.gov
yohannes.ejigu@usdoj.gov

For the Plaintiff, MICHAEL RADICE:
CORENA LARIMAR, ESQ.
Anti-Defamation League
40 Court Street
Fl 12
Boston, Massachusetts 02108
617.406.6333

For the Defendant:
KATON LAW
BY:   GLENN KATON, ESQ.
385 Grand Avenue
Oakland, California  94610
510.463.3350
gkaton@katon.law

Page 340

Videographer:

MARCUS MAJORS

Also Present (Via Zoom)

BRENDAN HOGAN

OMAR WICZYK

NOOR BARROWS

ASIAH

DYANI'S IPHONE

GWEN BEAUSSEJOUR

CIVIL FREEDOM

DARIUS

BELINDA RAMS

Page 341

INDEX

EXAMINATION BY COUNSEL

                                                    PAGE NO.

Examination by Mr. Meuti                              348

Examination by Mr. Basrawi                           468

                         EXHIBITS

Exhibit No.              Description              Page No.

Exhibit Number 22  Defendant Harara's Responses
                   to Michael Radice's First Set
                   of Requests for Production
                   and First Set of Requests for
                   Admission                             359

Exhibit Number 23  Defendant Harara's Response
                   to Radice's First Set of
                   Interrogatories                       360

Exhibit Number 24  Signature Page to Defendant
                   Harara's Response to Radice's
                   First Set of Interrogatories          361

Exhibit Number 25  Photograph                            362

Exhibit Number 26  Text Messages                         363

Exhibit Number 27  Text Messages                         377

Exhibit Number 28  Text Messages                         381

Exhibit Number 29  Test Messages                         384

Exhibit Number 30  Text Messages                         385

Exhibit Number 31  Text Messages                         386

Exhibit Number 32  Text Messages                         387

Exhibit Number 33  Text Messages                         387

Exhibit Number 34  Text Messages                         389

Exhibit Number 35  Text Messages                         389

Exhibit Number 36  Text Messages                         390

Exhibit Number 37  Text Messages                         391

Exhibit Number 38  Text Messages                         391

Exhibit Number 39  Page Vault                            401

Exhibit Number 40  Text Messages                         401

Page 343

Exhibit Number 41    Text Messages                    406

Exhibit Number 42    Page Vault                       410

Exhibit Number 43    Text Messages                    412

Exhibit Number 44    Text Messages                    414

Exhibit Number 45    Instagram Posts                  419

Exhibit Number 46    Jerusalem Coffee House

                     Instagram Posts                  430


Exhibit Number 47    iMessage Texts                   434


Exhibit Number 48    Jerusalem Coffee House

                     Instagram Posts                  436

Exhibit Number 49    Instagram Posts                  437

Exhibit Number 50    Page Vault                       439

Exhibit Number 51    Page Vault                       440

Exhibit Number 52    Photograph                       449

Exhibit Number 53    Complaint                        504

Exhibit Number 54    Photograph                       534

Exhibit Number 55

& Number 56          Flash Drive                  551/590

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

MICHAEL RADICE,

Plaintiff,

Vs.                    Civil Action No. 25-cv-2060

JERUSALEM BOXING CLUB, LLC,

Defendants.

_____/


UNITED STATES OF AMERICA,


Plaintiff,


Vs.          Case No. 3:25-cv-04849-SI


FATHI ABDULRAHIM HARARA and NATIVE

GROUNDS, LLC, d/b/a JERUSALEM

COFFEE HOUSE,


Defendants.

_____/


--o0o--


BE IT REMEMBERED, that on Friday, March 27, 2026, at the hour of 9:16 a.m. thereof at Benesch, Friedlander, Coplan & Aronoff, LLP, 100 Pine Street, Suite 3100, San Francisco, California before me, Carol S. Nygard, a Certified Shorthand Reporter of the State of California, there personally appeared,

ABDULARAHIM FATHI HARARA,

called as a witness by the Plaintiffs, who, being by me

Page 363

A.    I -- I know them to have been a public organization to gladly use the word "Negro."

Q.    Okay.  Did you know that before October 26th, 2024 or is that something that you came to learn after that date?

A.    I'm not sure.  I don't know.  I can't recall.

Q.    Okay.  Did you know anything else about the Hebrew Orphan Asylum before October 26th, 2024?

A.    Might have been in New York.  It was a baseball team, minor league team.

Q.    And you knew that before October 26th, 2024?

A.    Yeah.

MR. MEUTI:  Okay.

(Exhibit Number 26 was marked for Identification.)

MR. MEUTI:  I'm sorry.  I need to break these up.

26.

BY MR. MEUTI:

Q.    You have before you what's been marked as Exhibit 26.  This is a series of text messages that were pulled from what was previously marked as Exhibit 2.

Do you have any reason to dispute that?

A.    No.

Q.    And the transcript will reflect that you

Page 364

testified that you took the screen shots appearing in

Exhibit 2.

It appears that Exhibit 26 depicts a screen

shot of the results of a search that was run for the

word "Jew" or "Jewish" in your iPhone's message app.

Do you agree?

A.    Sure, yes.

Q.    You took the screen shots appearing in Exhibit

26; correct?

A.    Correct.

Q.    And you took those screen shots without

opening the threads containing the search term; correct?

A.    Incorrect.

Q.    You opened the --

A.    Yes.

Q.    Okay.  The top message, --

A.    Yes.

Q.    -- when you took this page --

A.    Yes.

Q.    -- this --

I'm asking just about when you took --

A.    Yes.

Q.    -- this.

A.    Yes.

Q.    Okay.  Why are there no text messages above or

Page 365

beneath the text message that you sent to Gabriel Garay on --

A.     Because they're --

Q.     -- October 24th, 2025?

A.     My apologies.

Because the context is irrelevant.

Q.     Okay.  So you chose not to include any further context around the text messages that appear on -- on Exhibit 26; correct?

A.     Incorrect.

Q.     Okay.  Explain to me.

A.     What would you like me to explain?

Q.     I would like you to explain why -- why, if we look at the screen grabs --

A.     Uh-huh.

Q.     -- on Exhibit 26 there are no messages for before or after the message sent to Gabriel Garay, and, instead, what appears immediately beneath the text message to Gabriel Garay is a text message that you sent to Tarah Lim.

A.     Sure.

Do you recall the discovery request that was made to me?

Q.     I ask the questions here.

A.     Yeah.

Do you recall it?

Q.   I ask the questions here.

A.   I don't know if you --

Well, if you go ahead and you refresh your memory and you recall the discovery request, the discovery request requested that I share authored posts with specific keywords.

The discovery requests did not ask me for context for the names of people that I communicated with, for their phone numbers, for historical conversation.

The discovery request plainly asked that I send authored posts with specific keywords such as "Jew," "Jewish," "Zionist," "Israel," "Hirsh," "Radice."

And that's what I did, I complied fully to your discovery request.  I'm sorry that you don't -- that you're unhappy with it.

I'm sorry that you didn't get the results that you wanted, but that's what you asked for, and that's what I provided you with.

Q.   Whether you complied or not is a question that we're not here to debate.  We have a Court who can decide that.

What I want to know right now is mechanically how were the screen grabs in Exhibit 26 created.

Page 367

Well, let me -- let me go step-by-step.

To create the screen grabs that appear in Exhibit 26, you first searched for "Jew" in your iMessage app; correct?

A.   To be honest with you, I -- I worked diligently and for many hours to collect these screen shots.

As you can see, there's maybe over 200 text messages that I sent you.  It was -- it was very laborious, it was mentally exhausting, but I complied to the request, and I have no further answers for questions about how I grabbed these text messages for you.

MR. MEUTI:  I'm going to move to strike that as nonresponsive and ask that my question be read back.

(Record read.)

THE WITNESS:  Correct.

BY MR. MEUTI:

Q.   Okay.  And rather --

Strike that.

And after searching for "Jew" in your iMessage app you took a screen shot of the results of that search; correct?

A.   Possibly.

Q.   And what appears in Exhibit 26 is the results of that search; correct?

A.    Correct.

Q.    It contains the messages that contained the search term; correct?

A.    Incorrect.

Q.    Explain.

A.    It contains the text message that I authored that has the search term that you requested that I shared that I authored.

Q.    Okay.  And you took these screen shots appearing in Exhibit 26 from the search results without opening up the individual messages and taking screen shots of the conversation threads containing the hit terms; correct?

A.    Whatever was asked of me on the discovery request I complied with.

Q.    This is a "yes" or "no" question.

A.    No, it's not, not to me.

MR. MEUTI:  I'll ask that my question be read back.

(Record read.)

THE WITNESS:  I don't understand the question.

BY MR. MEUTI:

Q.    Okay.  Exhibit 26 does not contain any further messages from you or from Gabriel Garay in the 11-24-25 conversation; correct?

Page 374

don't talk while --

THE WITNESS:  Okay.

MR. KATON:  -- Mr. Meuti --

Even -- even if you want to agree mid-sentence, just wait until he finishes, and then pause and then respond; okay?

THE WITNESS:  Okay.

BY MR. MEUTI:

Q.    Exhibit 26 --

A.    Uh-huh.

Q.    -- contains screen grabs showing the search results; correct?

A.    Correct.

Q.    It does not show screen grabs of the individual text threads containing the hits; correct?

A.    Correct.

Q.    Okay.  And you are the one who took the screen grabs appearing in Exhibit 26; correct?

A.    Correct.

Q.    Okay.  Now, as I flip through Exhibit 26, I see 22 messages pulled from the search for "Jew" or "Jewish."

Do you have a reason to dispute that?

A.    No.

Q.    And none of the 22 messages appearing in

Page 377

Q.    -- can I tell whether you had communicated at at any other time with Tarah Lim or not?

A.    Yes.

Q.    How?

A.    So on the first page of DEFS0299 it says that I communicated with her on 9-28-25, and then, if you go over to --

If you go over to --

Q.    I'm looking only at Exhibit 26 right now.

A.    Yeah, Tarah's name doesn't come back up.

Q.    Okay.  So, again, my question is, because you screen shot it, the search results as opposed to the text threads, we cannot tell from Exhibit 26 whether any further conversation took place between you and Tarah Lim; correct?

A.    That's how --

That's what it seems like, yeah.

MR. MEUTI:  Okay.

(Exhibit Number 27 was marked for Identification.)

BY MR. MEUTI:

Q.    You now have what's been marked as Exhibit 27. This was also pulled from text messages that you've already authenticated.

This appears to be the results from a search

Page 378

for "Zionist" or "Zionism."

Do you have any reason to dispute that?

A.    No.

Q.    Focusing on the mechanics of how the messages in Exhibit 27 were pulled, did you run a search in your iMessages and then take screen grabs of the results?

A.    Yes.

Q.    And, by doing so, Exhibit 27 does not contain any further messages in the text threads from the various texts that hit; correct?

A.    Correct.

Q.    Okay.  Explain.

A.    Explain what?

Q.    Explain where the -- the additional text messages are in Exhibit 27.

A.    You probably don't need them.

Q.    That's not the question.

We're looking --

We're concerning ourselves with not whether I need them or not, but the mechanics with how you put this together.

A.    That's not what you asked.  You asked where's the text messages -- right?

Q.    I'm not here to argue with you.

A.    Yeah.

Page 379

Q.    I just need answers to my questions.

A.    Is your question where is the text messages?

Q.    No, it's not where is the text messages.

A.    What's your question?

MR. MEUTI:  I'll ask that it be read back.

(Record read.)

MR. MEUTI:  Let me follow that up.

THE WITNESS:  Not happy with it?

MR. MEUTI:  There was a question farther back, but I can't find it now.

THE REPORTER:  I could find it.

MR. MEUTI:  Please.

(Record read.)

BY MEUTI:

Q.    Okay.  So the question isn't whether I need them.

A.    Yeah, it's where are they.

Q.    The question is, can you see them in Exhibit 27?

A.    Is it can I see them or is it where are they?

Q.    Are they captured in Exhibit 27?

A.    No.

Q.    Okay.  And, because you took screen shots from the search results as opposed to the individual text threads, we can't tell from Exhibit 27 whether any

further conversation took place; correct?

A.    That's speculative.

Q.    It's a "yes" or "no" question.

A.    Incorrect.

Q.    Why is it incorrect?

A.    I don't know.  It's speculative.

Q.    Your testimony is that --

A.    What you're saying is subjective, and you're trying to make me answer a subjective question objectively.

Why would I do that?

Why would I tell you that there's no further context for sure when over here there -- the further context is with Turkey.

Q.    I'm focused on Exhibit 27.

A.    I don't know.

Q.    Can I tell from Exhibit 27 whether there is any further conversation with "We'll take your message" to Sadi?

A.    Uh-huh.

Q.    For example, can I tell from Exhibit 27 whether Sadi responded to this text message?

A.    No.

Q.    Can I tell whether she sent you something previously that triggered your text message appearing in

Page 381

Exhibit 27?

A.    No.

Q.    And I will represent to you that Exhibit 27 contains 18 different text messages that you sent.

Any reason to dispute that?

A.    No.

Q.    So we're up to 40 now.

Now, you searched for "Zionism" and "Zionist" it appears.

Did you search for "Zio"?

A.    Yeah.

Q.    You did?

A.    Yeah.

Q.    Did it include any hits?

A.    Just "Zionist" and "Zionism," because it has Z-i-o.

(Exhibit Number 28 was marked for

Identification.)

BY MR. MEUTI:

Q.    Do you have any log reflecting that you searched for "Zio"?

A.    I thought we were doing this in good faith, and I complied with the discovery faith -- with the discovery request in good faith.

Q.    Do you have a log reflecting that you searched

Page 382

for "Zio"?

A.    Like did I have someone recording me or documenting that I was searching and they -- an independent observer watching me comply with the discovery request?

Q.    Sure, let's ask that.

A.    No, I didn't have an --

Q.    Okay.

A.    -- independent observer.

Q.    Okay.  And did you write down which terms you searched for?

A.    Yeah.

Q.    You have a log --

A.    Yeah.

Q.    -- showing which terms you searched for?

A.    I have an E-mail back-and-forth between --

MR. KATON:  Don't -- don't talk over him.

THE WITNESS:  Yeah.

Okay.  Yeah.

MR. MEUTI:  Okay.  I'm going to ask that that log be produced, Glenn.

THE WITNESS:  I actually think you can't because it's attorney-client privilege.  So --

MR. KATON:  You don't have to assert --

MR. MEUTI:  Something we'll take up with the

Court.

MR. KATON:  I'll write down your -- your request, and we can meet and confer about it.

MR. MEUTI:  If there is a log reflecting what was done in order to generate the discovery, the Court ordered you to produce that already.

I believe that we are entitled to that.

If you want to meet and confer further, I'm happy to do that.

MR. KATON:  I don't remember the Court ordering us to produce a log, but I do think this is a discussion that --

If you want to have it on the record and take up pages, that's fine.

I don't --

I don't remember that order, and I don't know if it is privileged, so we'll have to address it later.

MR. MEUTI:  Yeah, no need to take up pages on the record.  Note my request.  We can meet and confer later; fair?

MR. KATON:  Fair enough.

BY MR. MEUTI:

Q.    Okay.  You have in front of you what's been marked as Exhibit 28.

A.    Correct.

Q.    This appears to be the results -- or screen grabs of the results of the searches in your iMessages app for "Hamas;" is that correct?

A.    Correct.

Q.    And, again, you screen grabbed the search results; correct?

A.    Correct.

Q.    You did not screen grab the individual conversation threads in a way that would reflect adjacent messages; correct?

A.    Correct.

Q.    All right.  And I will represent to you that Exhibit 28 contains six such messages.

Any dispute there?

A.    No.

MR. MEUTI:  Okay.  So we are up to 46 messages now.

(Exhibit Number 29 was marked for

Identification.)

MR. MEUTI:  29.

THE WITNESS:  Thank you.

BY MR. MEUTI:

Q.    You have in front of you what's been marked as Exhibit 29.  Exhibit 29 reflects screen grabs from your iMessages app after you searched for "anti-Semitism;"

Page 385

correct?

A.    Correct.

Q.    And the screen grabs were directly from the search; correct?

A.    Correct.

Q.    The screen grabs do not capture adjacent messages; correct?

A.    Correct.

Q.    And I will represent to you that there are four messages in Exhibit 29.

Any dispute?

A.    Nope.

Q.    That brings us to 44; correct?

A.    Doesn't that bring us to 50?

Q.    I have 22 plus --

You're correct.  You're correct.  I'm sorry.

You're better at math than I am.

So we're up to 50 text messages between Exhibit 26 --

A.    We got it locking.

Q.    -- through 29.

A.    It's locking.

MR. MEUTI:  Appreciate that.

I'm sorry.  That should go to Glenn.

(Exhibit Number 30 was marked for

Page 386

Identification.)

THE WITNESS:  Thank you.

BY MR. MEUTI:

Q.    30 reflects screen grab from a search for
"Tikkun;' right?

A.    Correct.

Q.    Okay.  And there appear to be two text
messages here; correct?

A.    Correct.

Q.    So we're up to 52?

A.    Yeah, correct.

(Exhibit Number 31 was marked for

Identification.)

THE WITNESS:  Thank you.

BY MR. MEUTI:

Q.    You have in front of you now what's been
marked Exhibit 21 (sic.).  It appears to be screen grabs
taken from a search in the iMessages app at -- for "Star
of David;" correct?

A.    Correct.

Q.    And, because the screen grabs were taken
directly from the search results without the individual
messages opened, it does not contain any adjacent
messages to the ones contained in the search hit;
correct?

A.   Correct.

Q.   I'll represent that there are three text messages in Exhibit 31.

That brings us to 55; correct?

A.   Correct.

(Exhibit Number 32 was marked for Identification.)

THE WITNESS:  Thank you.

BY MR. MEUTI

Q.   Exhibit 32 is a series of screen grabs from what appears to be searches in the iMessages app for the word "Sinwar;" correct?

A.   Correct.

Q.   And, like the previous exhibits, because the screen grabs were taken directly from the search results, they do not contain adjacent messages to the ones that the search term hit on; correct?

A.   Correct.

Q.   And there are six text messages in Exhibit 32.

Any reason to dispute that?

A.   No.

MR. MEUTI:  That brings us to 61.

(Exhibit Number 33 was marked for Identification.)

BY MR. MEUTI:

Page 388

Q.    You have in front of you what's been marked as Exhibit 20 -- I'm sorry -- 33.

33 appears to be the results of searches run in the iMessages app for the word "Israel."

Do you agree?

A.    Agree.

Q.    Okay.  And, like the previous exhibits, these screen grabs were taken directly from the search results and do not contain adjacent messages to the message upon which the search term hit; correct?

A.    Is this like the same question over and over again?

I just want to make sure.

Q.    It is.

A.    Yes, correct.

Q.    Okay.  And there are -- five text messages in Exhibit 33; correct?

A.    Correct.

MR. MEUTI:    That brings us to 66.

Can we go off the record for just a moment?

VIDEOGRAPHER:    This marks the end of media file number 1.

10:07 23              Off the record at      a.m.

(Discussion off the record)

VIDEOGRAPHER:    This marks the beginning of

Page 389

media file number 2.

10:08    Back on the record at    a.m.

(Exhibit Number 34 was marked for

Identification.)

BY MR. MEUTI:

Q.    You have in front of you now what's been

marked as Exhibit 34.  It reflects a screen grab from a

search for the word "eject" in the iMessages app;

correct?

A.    Correct.

Q.    If I ask the same questions as I did for the

past several exhibits, 33, 32, and so on, would you give

the same answers?

A.    Correct.

Q.    Okay.  And I count, one, two, three, four in

Exhibit 34.

Do you agree?

A.    Agree.

MR. MEUTI:  All right.  That brings us to 70.

(Exhibit Number 35 was marked for

Identification.)

MR. MEUTI:  35.

BY MR. MEUTI:

Q.    You have now what's been marked as Exhibit 35.

What are you doing on your phone right now?

A.    I was putting it on silent.

Q.    Okay.  Thank you.

Exhibit 35 appears to be screen grabs from an iMessage search for the word "trespass;" correct?

A.    Correct.

Q.    Same question to the last several exhibits, same answers?

A.    Correct.

Q.    Okay.  And there are two here.

We're up to 72; correct?

A.    Correct.

(Exhibit Number 36 was marked for

Identification.)

MR. MEUTI:  Oops.  I'm sorry.

THE WITNESS:  Thank you.

BY MR. MEUTI:

Q.    All right.  You have in front of you now what's been marked as Exhibit 36.

This reflects screen grabs from an iMessage search for "ADL;" correct?

A.    Correct.

Q.    If I ask the same questions as I did for the preceding several exhibits, you would give the same answers; correct?

A.    Correct.

Q.    And Exhibit 36 contains -- five messages, so that would bring us to 77; correct?

A.    Correct.

(Exhibit Number 37 was marked for Identification.)

BY MR. MEUTI:

Q.    Exhibit 37 should be in front of you.

It contains what appear to be iMessage screen grabs from a search for "October 7th."

Do I have that correct?

A.    Correct.

Q.    If I asked the same questions as I did for the past several exhibits, would you give the same answers?

A.    Correct.

Q.    There are two in Exhibit 37, which brings us to 79; correct?

A.    Correct.

(Exhibit Number 38 was marked for Identification.)

MR. MEUTI:   38.

BY MR. MEUTI:

Q.    You have in front of you now what's been marked as Exhibit 38, which appears to be a screen grab from an iMessage search for the words "kicked out."

Do you agree?

Page 392

A.    Agree.

Q.    And, if I asked the same questions that I asked for the preceding exhibits, would you give the same answers?

A.    Yes.

Q.    Okay.  And there are two here, which brings us to 81; correct?

A.    Correct.

Q.    All right.  Now, we've talked a couple of times about "Bates labels."

Do you understand what "Bates labels" are?

A.    Yeah.

Q.    Okay.  And all of the documents you've produced in this case bear the Bates label "DEFS;" correct?

A.    Correct.

Q.    They do not distinguish between documents that you produced personally and documents that your business produced; right?

A.    I don't know that much about Bates numbers.

Q.    Okay.  Do you maintain possession, custody or control over any documents that your business entities do not have access to?

A.    That my business entity?

Q.    Do not have access to.

A.    Yeah.

Q.    -- can you post to them?

A.    Yeah.

Q.    And, if you have log-in access to those accounts, can you remove posts from them?

A.    Yeah.

Q.    Okay.  To your knowledge have you produced any documents from the three E-mail addresses that you use?

A.    Documents that were relevant to the case?

Is that what you're asking?

Define "documents."

Q.    I'm asking if you have produced any E-mails from any of the three accounts that you use in this case.

A.    But what kind of documents?

Q.    Have you produced any documents in this case?

A.    From my E-mail.

Q.    Correct.

A.    Like what --

Like, you know, can you specify "documents"?

Do you mean like documents that reveal communications about Radice, about my client?

Like what are you asking?

Q.    I'm not asking about the content.

I'm asking if in this case you have produced

Page 397

any E-mails.

Do you know?

A.    I don't understand your question.

Q.    Okay.  You don't know what it means to "produce an E-mail in this case"?

That's your testimony?

A.    Like it's --

You're asking like such a complicated question, because I E-mailed all this information to my lawyer.  My older -- my lawyer E-mailed it to you.

So I produced E-mails.

I -- I don't understand.

Like do you --

Like are you asking if like I had a conversation with somebody years ago in my E-mail and I produced it?

Q.    I'm asking if you produced any E-mails in this case.

A.    I just asked you to clarify your question, but you don't want to, so I will just tell you I don't know.

Q.    Very well.

Do you have a Tik Tok account?

A.    The coffee house has a Tik Tok account that is dormant.

Q.    Okay.  Do you have a personal Tik Tok account?

Page 401

the nomenclature right there.

(Exhibit Number 39 was marked for

Identification.)

THE WITNESS:  Thank you.

BY MR. MEUTI:

Q.    All right.  You have in front of you now what's been marked as Exhibit 39.

As you page through Exhibit 39, do you have an understanding of what Exhibit 39 contains?

A.    I'm still looking through it.

Q.    Okay.  Based on the first several pages do you have an understanding of what Exhibit 39 contains?

A.    Yeah, it's my Twitter feed.

Q.    Correct.

And I'll represent to you that Exhibit 39 is a Page Vault capture of your complete Twitter feed for the handle @rahimJBC taken on January 15th, 2026 as the front page of Exhibit 39 reflects.

Do you have any reason to disagree with that characterization?

A.    No.

Q.    Does Exhibit 39 accurately capture your complete Twitter feed as of January 15th, 2026?

A.    I think so.

(Exhibit Number 40 was marked for

Page 406

A.    I've always thought they were a clown ass organization.

Q.    And you took their call to release hostages as an opportunity to voice that opinion; correct?

A.    Incorrect.

Q.    Okay.  Explain.

A.    I just called them a "clown ass organization."

MR. MEUTI:  Very well.

(Exhibit Number 41 was marked for Identification.)

BY MR. MEUTI:

Q.    You have in front of you now, Mr. Harara, what's been marked as Exhibit 41.  I'll represent to you that Exhibit 41 is a screen grab taken on January 7th of this year to a post to your Twitter account @rahimjbc with a user name Bay Area -- or screen name Bay Area.

Do you have any reason to dispute that?

A.    No.

Q.    Okay.  Exhibit 41 shows that you reposted a tweet on November 2nd, 2024; correct?

A.    Correct.

Q.    And that tweet refers to Jonathan Hirsch; correct?

A.    Correct.

Q.    You did not offer any comment with that

Page 409

doesn't resonate with me.

Q.    Okay.  I would like --

I'd like you to pull Exhibit 39 back, please.

As you flip through Exhibit 29 --

MR. KATON:  You mean 39?

MR. MEUTI:  I'm sorry.  39.

BY MR. MEUTI:

Q.    The tweets appear roughly in reverse chronological order; correct?

The most recent tweets appear on top, and then, as you work through the account capture, the tweets work backward in time; correct?

A.    Correct.

Q.    I want you to flip to the point in your timeline corresponding to November 2024, and, for reference, it appears on page 11 of 41.

A.    Okay.

Q.    I'd like you to take a look at page 11, and then you can flip back to page 10.

A.    Okay.

Q.    Do you see the November 2nd, 2024 repost of that tweet about Jonathan Hirsch?

A.    On page 10?

Q.    On page 10, or 11, or, if you want to continue flipping, do you see it anywhere in page 39?

Page 410

A.    I don't see it.

Q.    Okay.  Can you think of any reason that the Jonathan Hirsch re-tweet did not appear in your complete Twitter feed on January 15th, 2026?

MR. KATON:  Object to the form.

THE WITNESS:  It's on there right now, so I don't know what you're talking about.

It's probably an error on whoever collected my Twitter feed.

BY MR. MEUTI:

Q.    Okay.  Aside from that, can you think of any reason why the Jonathan Hirsh re-tweet did not appear in your complete Twitter feed on January 15th, 2026?

A.    So, if there wasn't an error in how you compiled your own documents, it's not -- I'm not at liberty to decide the --

You have to go double-check your work.

Q.    Okay.  My question was a little bit different.

Aside from that potential error that you just speculated about, can you think of any other reason why the November 2nd, 2024 repeat about Jonathan Hirsch would not have appeared in your complete Twitter feed on January 15th of this year?

A.    No.

MR. MEUTI:  Okay.  42.

Page 455

A.    Nope.

Q.    To your knowledge have funds raised by Defend JCH been used to pay any of your legal expenses in -- in -- related to this case?

A.    I don't know.

Q.    Okay.  Have you ever witnessed Gabriel Garay say anything about Jews?

A.    No.

Q.    Okay.  Have your ever witnessed Nailah Amin Yasin say anything about Jews?

A.    No.

MR. MEUTI:  Okay.

In Exhibit 3 --

I'll hand to you Exhibit 3 and I would like you -- I'd like to direct your attention to the next to last page marked -- or Bates stamped Defense 374.

THE WITNESS:  Okay.  Uh-huh.

BY MR. MEUTI:

Q.    There is black digital scribbling over an image --

A.    Uh-huh.

Q.    -- on that page.

Did you put the black scribbling there?

A.    Uh-huh.

Q.    Okay.  Why?

Page 456

A.    Because you're not at liberty to see what's in that message.

Q.    Okay.  I'd like -- I'd like to direct your attention to --

MR. MEUTI:  Okay.  I believe I'm done.

Let's go off the record so that you can get to service and we can reconvene in the afternoon.

VIDEOGRAPHER:  This marks --

This marks the end of media file labeled number 4.

Off the record at      p.m.

(Thereupon a recess was taken at      p.m. and the deposition resumed at 2:46 p.m.)

VIDEOGRAPHER:  This marks the beginning of media file labeled numbers.

Back on the record at 12:46 p.m.

BY MR. MEUTI:

Q.    Good afternoon, Mr. Harara.

You understand you're still under oath; correct?

A.    Correct.

Q.    Okay.  I wanted to talk for a moment about the timing of the first vandalism event you mentioned at the cafe.

Do I understand correctly that the first event

Page 462

noticed the iPad was missing, so asked him if he had it. He told me "yes."

And I was like, cool, it's not stolen, it's not missing, he has it, it's in his possession.

Q. Understood.

And do you know what year that text exchange occurred in?

A. Umm -- no, but to be honest with you -- no.

Q. Okay. In Exhibit 3 I would like you to turn to the page bearing the Bates Number Defendant's 366.

A. Uh-huh.

Q. The counterparty in this text exchange is not identified on page 366; --

A. No.

Q. -- is it?

A. No.

Q. Okay. That information has been cropped out; correct?

A. Yeah, it has been.

Q. Do you know with whom you were conversing --

A. Yes.

Q. -- on this page?

A. Yes.

Q. Who?

A. My friend.

Page 464

A.   Muhammad.

Q.   Okay.  Does Muhammad have a last name?

A.   I don't know it.

Q.   Your phone would reflect Muhammad's contact information; correct?

A.   If it's saved in my phone.

Q.   Okay.  This text thread --

Before I ask that, is Muhammad a close friend?

A.   I don't really have friends.

Q.   I'm confused.

You told me that this was a text thread with a friend.  Now you're telling me you don't have friends.

Which of it is -- is true?

A.   The people I communicate with, the majority of them are people that confide and that I have love with.

They're not really like friends in the sense that you think of the word "friend."

Q.   Okay.  So Muhammad is somebody you confide in and have love for; correct?

A.   Yes, correct.

Q.   Okay.  The thread on Defendants 366 reflects an exchange on April 4th, which is a Friday, the year is not identified; correct?

A.   Correct.

Q.   Do you believe this exchange occurred in 2025?