Krista M. Enns (CA 206430)
BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone: 628.600.2250
kenns@beneschlaw.com

Michael D. Meuti (CA 227939)
Michael Montgomery (*Admitted Pro Hac Vice*)
Peter J. Sullivan (*Admitted Pro Hac Vice*)
BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216.363.6235
mmeuti@beneschlaw.com
mmontgomery@beneschlaw.com
psullivan@beneschlaw.com

Corena G. Larimer (CA 277188)
ANTI-DEFAMATION LEAGUE
40 Court Street, Suite #12
Boston, MA 02108
Telephone: 212.885.7700
clarimer@adl.org

James Pasch (*Admitted Pro Hac Vice*)
ANTI-DEFAMATION LEAGUE
605 Third Avenue
New York, NY 10158
Telephone: 212.885.7700
jpasch@adl.org

*Attorneys for Plaintiff*

Ramsey Judah
Judah Law Group, LC
1026 Foothill Blvd
Upland, CA 91786
Telephone: (626) 899-7667
ramsey@JudahLawGroup.com

Jonathan Wallace
(*Admitted Pro Hac Vice*)
PO #728
Amagansett, NY 11930
Telephone: (917) 359-6234
jonathan.wallace80@gmail.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MICHAEL RADICE,<br><br>Plaintiff,<br><br>v.<br><br>JERUSALEM BOXING CLUB, LLC; NATIVE GROUNDS, INC.; ABDULRAHIM HARARA; DOES 1-20<br><br>Defendants. | Case No. 3:25-cv-02060-SI<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF DISCOVERY SANCTIONS AND FEES**<br><br>Date: n/a<br>Magistrate Judge Thomas Hixson<br><br>First Amended Complaint Filed: 04/15/2025<br><br>Trial Date: 10/26/2026 |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. LEGAL STANDARD ..... 2

A. Rule 37 and the Court's inherent authority empower the Court to award sanctions when a party flouts a court order regarding discovery ..... 2

B. Terminating sanctions are appropriate when a party's bad-faith discovery conduct undermines the search for truth. ..... 2

III. ARGUMENT ..... 3

A. Harara has flouted at least six discovery orders. ..... 3

1. Harara defied the Court's order to search his email accounts and produce responsive emails. ..... 4

2. Harara has failed to obey the Court's order to produce responsive hard-copy documents, including those that he testified he collected for this case. ..... 5

3. Harara failed to obey the Court's order to produce custodial ESI. ..... 5

4. Harara failed to obey the Court's order to produce a complete privilege log. ..... 5

B. Harara has abused the judicial process obstructed the search for truth by lying under oath, destroying evidence, and working to hide inculpatory evidence. ..... 6

1. Harara has submitted false testimony. ..... 7

2. Harara has intentionally destroyed responsive communications. ..... 9

3. Harara has obstructed discovery by hiding responsive text messages. ..... 10

4. Harara withheld, until two months after discovery closed, social-media messages reflecting animus against Jewish people. ..... 14

5. Harara continues to withhold evidence and refuses to follow counsel's instructions. ..... 14

C. Plaintiff has suffered prejudice from Harara's abuse of the judicial process. ..... 15

1. Harara's obstruction has delayed resolution of this case. ..... 15

2. Harara's tactics have hampered Plaintiff's preparation for trial. ..... 15

3. Harara's tactics have caused Plaintiff's counsel to spend hundreds of hours addressing Harara's failure to meaningfully participate in discovery. .......... 16

D. The Court should sanction Defendants. .......... 16

1. Terminating sanctions are appropriate. .......... 16

2. In the alternative, the Court should draw adverse inferences from Harara's bad-faith abuses of the discovery process. .......... 18

3. The Court must also award a monetary sanction. .......... 19

IV. CONCLUSION .......... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advantacare Health Partners, LP v. Access IV*,
No. C 03-04496 JF, 2004 WL 1837997 (N.D. Cal. Aug. 17, 2004)........................................3

*AECOM Energy & Constr., Inc v. Topolewski*,
2022 WL 595937 (C.D. Cal. Feb. 25, 2022)...............................................................18

*Anheuser-Busch, Inc. v. Nat. Bev. Distribs.*,
69 F.3d 337 (9th Cir. 1995) ...............................................................................17, 18

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
2024 WL4823938 (N.D. Cal. Nov. 15, 2024) .......................................................20

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)..............................................................................................2

*Choudhuri v. Wells Fargo Bank, NA*,
2017 WL 5598685 (N.D. Cal. Nov. 21, 2019) ......................................................19

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
482 F.3d 1091 (9th Cir. 2007) ..........................................................................17

*Cruz v. Nike Retail Servs., Inc.*,
346 F.R.D. 107 (S.D. Cal. 2024) .........................................................................2

*Elecs. for Imaging, Inc. v. Photoscript Grp. Ltd.*,
Case No. C98-2759 SI (MED), 1999 U.S. Dist. LEXIS 7395 (N.D. Cal. May 10, 1999) ...........................................................................................3, 17

*Harrison v. Whole Foods Mkt., Inc.*,
No. 20-cv-04867-JSW (TSH), 2026 U.S. Dist. LEXIS 142351 (N.D. Cal. Apr. 28, 2026) (R&R adopted in full, 2026 U.S. Dist. LEXIS 142117 (May 20, 2026))............. *passim*

*Life Techs. Corp. v. Biosearch Techs., Inc.*,
No. C-12-00852-WHA(JCS), 2012 WL 1600393 (N.D. Cal. May 7, 2012)............................2

*In re Magsafe Apple Power Adapter Litig.*,
No. 5:09-CV-01911-EJD, 2015 WL 428105 (N.D. Cal. Jan. 30, 2015)...........................20, 21

*Multiple Energy Techs., LLC v. Casden*,
Case No. 2:21-cv-01149-(ODW), 2025 U.S. Dist. LEXIS 156065 (C.D. Cal. June 4, 2025) ............................................................................................10

*Nat'l Hockey League v. Metro. Hockey Club*,
427 U.S. 639 (1976)..............................................................................................2

*Oracle USA, Inc. v. SAP AG*,
264 F.R.D. 541 (N.D. Cal. 2009) .......... 2

*Transamerica Life Ins. Co. v. Arutyunyan*,
93 F.4th 1136 (9th Cir. 2024) .......... 17

*Valjakka v. Nexflix, Inc.*,
2025 WL 2118085 (N.D. Cal. Nov. 19, 2025) .......... 20

*Yu v. ByteDance, Inc.*,
759 F. Supp. 3d 992 (N.D. Cal. 2024) .......... 1, 3, 18

*Yu v. ByteDance Inc.*,
759 F.Supp.3d 993 (N.D. Cal 2024) .......... 16, 18

**Court Rules**

Fed. R. Civ. P. 37 .......... 2, 19

Fed. R. Civ. P. 37(b)(2)(A) .......... 2

Fed. R. Civ. P. 37(b)(2)(A)(i) .......... 18

Fed. R. Civ. P. 37(b)(2)(C) .......... 19

Fed. R. Civ. 37(b)(2)(C) .......... 2

At the September 15, 2026, discovery status conference, the Court instructed Plaintiff to file a supplement to his Motion for Discovery Sanctions [Dkt. #124] on or before September 23, 2026. Accordingly, Plaintiff submits this brief, the Declaration of Michael Dominic Meuti, the Declaration of Corena Larimer, and the exhibits attached to those declarations.

## I. INTRODUCTION

This case presents straightforward claims for discrimination in public accommodation at the Jerusalem Coffee House. But a straightforward trial on the merits is now impossible, because throughout discovery, Defendant Abdulrahim Harara has willfully impeded the search for truth.

Harara's lengthy record of abusing the judicial process includes violating at least six court orders, including four after the Court appointed a magistrate judge to oversee his counsel's attempts to rectify Harara's discovery abuses. It also includes submitting false testimony, refusing to search ESI sources likely to contain relevant evidence, destroying relevant and responsive evidence, and withholding responsive—and inculpatory—documents until long after discovery closed.

Against that record, whether Harara's misconduct warrants sanctions is an easy question. It does. The only open question is which sanctions are warranted. This Court's authorities answer that question. Its precedent—including opinions authored by the two jurists overseeing this case—recognizes that when a party's bad-faith conduct undermines the search for truth, terminating sanctions are appropriate. *Yu v. ByteDance, Inc.*, 759 F. Supp. 3d 992 (N.D. Cal. 2024) (Illston, J.); *Harrison v. Whole Foods Mkt., Inc.*, No. 20-cv-04867-JSW (TSH), 2026 U.S. Dist. LEXIS 142351 (N.D. Cal. Apr. 28, 2026) (Hixson, J.) (R&R adopted in full, 2026 U.S. Dist. LEXIS 142117 (May 20, 2026)).

Harara's history of flouting Court orders and falsifying, destroying, and withholding evidence is the exact type of extraordinary circumstance justifying a terminating sanction. All the more so because that misconduct continues as trial looms, and Harara's abuse of the discovery process will prevent a trial on the actual merits. Accordingly, the Court should enter terminating sanctions in the form of a default judgment against Harara and the two entities that he controls. If the Court does not award terminating sanctions, it should impose evidentiary sanctions against Harara, including finding that he harbors animus against Jewish people and that he refused service to would-be patrons, including Michael Radice and

Jonathan Hirsch, because they were Jewish. Either way, Rule 37 also requires monetary sanctions.

## II. LEGAL STANDARD

### A. Rule 37 and the Court's inherent authority empower the Court to award sanctions when a party flouts a court order regarding discovery.

Under Rule 37, discovery sanctions are appropriate when "a party … fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). Sanctions serve to both penalize parties who flout the discovery rules and deter others from doing so. *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976).

Available sanctions include "(i) directing that designated facts be taken as established; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses or from introducing designated matters in evidence; (iii) striking pleadings; (iv) staying proceedings; (v) dismissing the action; (vi) rendering default judgment; or (vii) treating the failure as contempt of court." Fed. R. Civ. P. 37(b)(2)(A). And when a party violates discovery orders, monetary sanctions are mandatory. Rule 37 states that the Court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure … unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). The target of the sanctions motion bears the burden of demonstrating that mitigating factors exist. *Cruz v. Nike Retail Servs., Inc.*, 346 F.R.D. 107, 111 (S.D. Cal. 2024).

A finding of bad faith is not a prerequisite to Rule 37 sanctions. *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 545 (N.D. Cal. 2009). Instead, "[s]anctions are permissible under Rule 37 when a party fails to comply with a court order, regardless of the reasons." *Life Techs. Corp. v. Biosearch Techs., Inc.*, No. C-12-00852-WHA(JCS), 2012 WL 1600393, at *8 (N.D. Cal. May 7, 2012).

In addition to the authority that Rule 37 confers, courts may also sanction discovery misconduct under their inherent powers "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).

### B. Terminating sanctions are appropriate when a party's bad-faith discovery conduct undermines the search for truth.

As noted above, "rendering default judgment" is an available sanction under Rule 37(b)(2)(A).

Such case-terminating sanctions are appropriate when the recalcitrant party "has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" or "conduct utterly inconsistent with the orderly administration of justice." *Yu v. ByteDance, Inc.*, 759 F. Supp. 3d 992, 999 (N.D. Cal. 2024) (Illston, J.) (citation omitted). Courts in the Ninth Circuit consider five factors when deciding whether to impose terminating sanctions: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* (citation omitted). In this calculus, "the most critical factor is not merely delay or docket management concerns, but truth." *Id.* (citation omitted).

Although terminating sanctions are an extraordinary remedy reserved for extraordinary circumstances, those extraordinary circumstances "exist where there is a pattern of disregard for Court orders and deceptive litigation tactics that threaten to interfere with the rightful decision of a case." *Advantacare Health Partners, LP v. Access IV*, No. C 03-04496 JF, 2004 WL 1837997, at *5 (N.D. Cal. Aug. 17, 2004). Thus, this Court has entered terminating sanctions when a party's discovery misconduct "has impeded the prompt resolution of this matter and prejudiced [the other party's] ability to obtain a full and fair trial on the merits of its claims." *Elecs. for Imaging, Inc. v. Photoscript Grp. Ltd.*, Case No. C98-2759 SI (MED), 1999 U.S. Dist. LEXIS 7395, *9–10 (N.D. Cal. May 10, 1999) (Illston, J.). Similarly, the Court has imposed terminating sanctions for engaging in conduct that "is antithetical to truth," including "submitting false evidence and filings, stonewalling [an adversary's] attempts to obtain candid responses from her in written discovery and deposition, refusing to comply with the Court's orders, and failing to justify [those] actions." *Harrison v. Whole Foods Mkt., Inc.*, No. 20-cv-04867-JSW (TSH), 2026 U.S. Dist. LEXIS 142351 (N.D. Cal. Apr. 28, 2026) (Hixson, J.) (R&R adopted in full, 2026 U.S. Dist. LEXIS 142117 (May 20, 2026)).

## III. ARGUMENT

### A. Harara has flouted at least six discovery orders.

Harara has repeatedly failed to live up to his discovery obligations. Those failures are not limited to failing to provide candid responses in discovery, failing to timely produce responsive documents, and

the like. They also include willfully disobeying at least six Court orders regarding discovery.

Plaintiff has already established that Harara failed to comply with the deadlines that the Court set in its April 7 Order [Dkt. 99] and its June 8 Order [Dkt. 120]. More specifically, Plaintiff's Motion for Sanctions shows that Harara failed to provide missing sender, date, and time information from previously produced text messages by April 17, and to respond to Plaintiff's second sets of written discovery requests by June 8. [*See generally* Dkt. 124.][1]

After Plaintiff moved to sanction Harara for violating those two Court orders, Harara asked the Court to appoint a magistrate judge to oversee his attempts to rectify his other discovery deficiencies. [Dkt. 121 (Wallace Decl.) ¶ 39.] The Court referred the case to Magistrate Judge Hixson to resolve discovery motions and to oversee Defendants' attempts to cure those deficiencies. [Dkt. 128.]

Since then, Harara has failed to obey at least four more Court orders.

***1. Harara defied the Court's order to search his email accounts and produce responsive emails.***

At the July 16 Discovery Conference, the Court ordered Defendants to search Harara's three disclosed email accounts and produce responsive emails. [Ex. F (7/16/26 Disc. Conf. Tr.) at 53:11-55:2.][2] At the August 31 Discovery Conference, the Court expressed its astonishment that Harara's emails had not been produced, and that his email accounts still had not even been searched, and found that Defendants had violated the Court's order. [Ex. G (8/31/26 Disc. Conf. Tr.) at 17:25-19:2.]

The Court stated at the July 16 Discovery Conference, "I don't think it's appropriate for Mr. Harara himself to do the review. I think counsel needs to do the review." [Ex. F (7/16/26 Tr.) at 54:20-22.] Regardless, Harara refused to export his email files to counsel until September 3. [Dkt. 182 at 4.] Aside from two stray emails, Defendants still have not made an email production. (Meuti Decl. ¶ 29.)

---

[1] Beyond these Court orders, Defendants violated a third—the Court's February 27 Order resolving Plaintiff's first discovery dispute. [Dkt. 80.] Defendants failed to timely respond, and failed to provide the information that the Court required them to provide, and provided false answers. [Meuti Decl. ¶¶ 11–15.]

[2] All exhibits denominated by letters are Exhibits to the Declaration of Michael Dominic Meuti in support of this Brief. All exhibits denominated by numbers are Exhibits to the Declaration of Corena Larimer in support of this Brief.

### *2. Harara has failed to obey the Court's order to produce responsive hard-copy documents, including those that he testified he collected for this case.*

At his deposition, Harara testified that he had collected a folder of hard-copy documents pertaining to this case. [Ex. S (Harara 3/25/26 Dep. Tr.) at 212:4-8, 212:17-24.] He did not produce them before the deposition, and he did not rectify that deficiency before discovery closed. During the July 16 Discovery Conference, the Court ordered Harara to produce them by August 7. [Ex. F (7/16/26 Disc. Conf. Tr.) at 60:2-17.] He still has not produced them.[3]

### *3. Harara failed to obey the Court's order to produce custodial ESI.*

At the July 16 Discovery Conference, the Court ordered Defendants to search for and produce custodial ESI residing on hard drives and cloud-storage accounts that Harara controls. Among the files to be produced were iterative drafts of the JCH menu and relevant photos and videos. [Ex. F (7/16/26 Disc. Conf. Tr.) at 69:23-70:8.] Harara's produced text messages reflect that Harara told others that he had his own videos of the Hirsch incident. [Ex. X at DEFS0308.]

On September 1, Harara produced from his iCloud drive three videos that he took during the Hirsch altercation. [Meuti Decl. ¶ 36.] He has not produced drafts or versions of the JCH menu from custodial files or other custodial files. [*Id.* ¶ 35.] Nor has he produced photos stored on his phone, his hard drive, or his cloud storage. [*Id.*] It is not clear whether he has permitted counsel to even review them.

### *4. Harara failed to obey the Court's order to produce a complete privilege log.*

Harara did not produce a privilege log before discovery closed. After discovery concluded, he produced approximately 16 screenshots of his Gmail inbox evidently bearing the results of separate keyword searches for "radice" and "hirsch." [Ex. FF.] Those screenshots redact subject-line information and do not depict the individual messages. (Gmail displays each thread on a single line.) Some participants in the threads are not Harara's lawyers. Those messages likely are not privileged.

At the July 16 Discovery Conference, the Court ordered Defendants to produce a privilege log by August 7. [Ex. F (7/16/26 Disc. Conf. Tr.) at 37:11-40:10.] Defendants produced a privilege log on

[3] On July 31, Harara produced hard-copy documents of hate mail that he received after the Hirsch incident, Bates labeled DEFS0513–0538. At his deposition, he testified that he separately gathered those documents. [Ex. S (Harara 3/25/26 Dep. Tr.) at 171:8–172:7.]

August 28, but it was incomplete, as it logged none of emails from the redacted screenshots identified above. [Ex. I (8/28/26 Priv. Log).] Plaintiff discussed that deficiency at the August 31 Discovery Conference, and the Court ordered the parties to meet and confer, for Defendants to produce a supplemental privilege log, and the parties to file a discovery dispute statement on September 14 if any dispute remained. [Ex. G (8/31/26 Disc. Conf. Tr.) at 9:23-10:7.] Plaintiff's counsel identified the deficiencies in writing on September 3. [Ex. J (9/3/26 Meuti email).] Defendant's counsel did not meet and confer until September 11, and when he did, he relayed that he would not be able to supplement the privilege log. [Dkt. 172 at 3.] Although he later said he would be able to supplement the privilege log [*id.*], Defendants still have not provided a complete privilege log.

### B. Harara has abused the judicial process and obstructed the search for truth by lying under oath, destroying evidence, and working to hide inculpatory evidence.

Harara's repeated violations of the Court's orders were no accident. Nor did they stem from mistakes or misunderstandings. Instead, they are the product of his devil-may-care attitude toward discovery in this case and toward the search for truth.

The record reflects as much. Twice now, his attorneys have sought to withdraw apparently because Harara refused to follow their admonitions to abide by his discovery obligations. In February, his initial counsel Glenn Katon moved to withdraw, citing a breakdown in the relationship [Dkt. 71], as disputes over Defendants' failures to comply with their discovery obligations were pending. [Dkt. 68.] Both the timing and manner of Mr. Katon's motion to withdraw strongly suggested that Harara's refusal to participate in discovery fueled the breakdown in the attorney/client relationship. [Dkt. 73 at 7–8.] And Mr. Katon all but confirmed as much at the February 27 hearing on that motion:

> the breakdown is such that I don't -- I obviously can't make Mr. Harara do things that he doesn't want to do or he thinks that is not right. So, that -- that challenge is going to continue, and I just -- I don't know how it's going to play out. I don't imagine it's going to play out in a way that the wheels are going to keep turning on this.
>
> [Ex. D (2/27/26 Hr'g Tr.) at 10:1-7.]

Harara's current counsel's recent motion to withdraw reflects the same issues. Counsel notes that:

- he "cannot make any promises to this Court or to the Magistrate Judge which require the client's cooperation with any confidence [he] can keep them" because he risks Harara's

"changing his mind about commitments already made and directing [counsel] not to keep them" [Dkt. 182 at 3], and

- Harara "continues to think he should not have to produce" exports of his social-media and email files, over a year after Plaintiff requested them and well after the Court ordered him to produce them. [*Id.* at 4:20-21.]

That obstructionist behavior contradicts not only Harara's obligations under the discovery rules, but also his prior representations to the Court. In his April 17 declaration, Harara pledged that he would "be reviewing everything" related to discovery "further with [current counsel], and we will update Plaintiff's counsel with any new or additional information." [Dkt. 105 ¶ 5.]

As reflected below, Harara's recalcitrance includes submitting false testimony, destroying responsive communications, and hiding inculpatory communications.

***1. Harara has submitted false testimony.***

Harara has willfully submitted false testimony about both the merits of the case and his discovery efforts. In his April 17 declaration, Harara swore under penalty of perjury that his email and cloud-storage accounts had been searched and contained no responsive documents. [Dkt. 105 ¶ 6.] That was false. On June 24, counsel produced 16 pages of redacted screenshots from Harara's Gmail and one email. [Ex. FF (DEFS0478–0486).] That search did not take place until June 19, and it returned many results predating Harara's April 17 declaration. [Dkt. 141-1] And not until September 3 did Harara export his inbox so that counsel could apply search terms and review "hits" for responsiveness. [Dkt. 182 at 4.] To this date, Plaintiff still does not know what other responsive emails exist; as far as Plaintiff knows, the agreed-upon search terms have never even been run on those email accounts. Additionally, not until September 1 did Harara produce from his iCloud storage three videos taken during the Jonathan Hirsch incident. [Meuti Decl. ¶ 36.] Harara's declaration, offered under penalty of perjury, was false.

Harara also gave false testimony repeatedly during his deposition. When asked about the "DefendJCH" legal-defense fund for the café, Harara claimed that he could not identify anyone involved in DefendJCH [Ex. T (Harara 3/27/26 Dep. Tr.) at 451:12-23], that he did not know whether DefendJCH operated a GoFundMe account to benefit the café [*id.* at 452:21-25], and that neither he nor his businesses received any money from DefendJCH [*id.* at 454:5–455:1; *see also id.* at 453:11-12 (claiming not to understand the question, "Have you received any money from Defend JCH?")].

Documents produced after his deposition show that his testimony was false. His June 24 production includes texts that he sent on Sunday, July 6, 2025 promoting an event at JCH "Hosted by DefendJCH." [Ex. K (DEFS0437).] His August 7 production includes a July 8, 2025 Instagram post on the @JerusalemCoffeeHouse account, which Harara controls, promoting a press conference at the café. [Ex. L (DEFS0931–932).] That post includes a QR code for the DefendJCH GoFundMe page, reflecting that Harara not only knew about the DefendJCH GoFundMe page, but actively promoted it. [*Id.*] That is not all. In late August, Harara produced bank records reflecting that between June 17, 2025 and June 12, 2026, he had received $71,117.50 from DefendJCH—and all but $6000 was received before his deposition. [Ex. M (DEFS6194).][4] Simply put, Harara abused the discovery process by lying under oath about DefendJCH and working to withhold plainly responsive documents reflecting the truth. An Instagram direct message produced in August suggests his motivation: "I'm trying to be strategic when it comes to the money that comes in so we can protect all our work from the lawsuit." [Ex. O at DEFS2349.]

Harara also falsely testified about his interaction with a Jewish customer, Jonathan Hirsch. He testified that he never told Hirsch that he had to leave the café and that he never asked the police to cite Hirsch for trespassing. [Ex. S (3/25/26 Harara Dep. Tr.) at 329:17–330:3.] Both statements were false. Videos of the encounter show Harara telling Hirsch:

- "I'm going to call the police if you don't leave. … You need to leave. You need to leave. You need to leave. You need to leave." [Larimer Decl. ¶ 3 (quoting IMG 7444, 0:18–0:28).]
- "This is a private business. You're being asked to leave. You want me to escort you out? You want me to escort you out? Leave my business. Get out of my business. Get out of my business." [*Id.* ¶ 4 (quoting IMG 7444, 2:50–3:05).]
- "This is a violent hat and you need to leave." [*Id.* ¶ 5 (quoting IMG 7444, 3:13–3:18).]

Oakland Police Department officers' bodycam footage shows that after they arrived, Harara repeatedly

[4] Harara evidently misled his counsel about the disposition of those funds. At the July 16 Discovery Conference, his lawyer noted his "understanding" that all those funds "went to pay legal fees to Glenn Katon before I got involved." [Ex. F (7/16/26 Disc. Conf. Tr.) at 63:20-23.] Documents produced in August reflect that Mr. Katon received only $20,500 of the funds raised and that Harara quit paying him in December 2025. [Ex. N (DEFS6197).] Harara thus misled his counsel and the Court by suggesting that he lacked resources to pay for e-discovery vendors or to pay a judgment in this case. [Meuti Decl. ¶ 43; Ex. F (7/16/26 Disc. Conf. Tr.) at 63:18-22 (stating that counsel understood that all of the funds raised were paid to Mr. Katon)].

demanded that police trespass Hirsch, telling police "I want him trespassed. Okay. I want him trespassed. So you want me to grab him in front of you and kick him out? . . . You want to remove him, or you want me to do it?" [*Id.* ¶ 6 (quoting Axon_Body_3_Video_2024-10-26_1306_X60A46593, 5:50-6:11).]

Harara also falsely testified that he had no video of the Hirsch incident. [*Id.* at 234:23–235:11, 326:21–327:1.] In fact, Harara had multiple videos of his October 26, 2024 interactions with Jonathan Hirsch, but he neglected to produce them to Plaintiff until earlier this month. [Meuti Decl. ¶ 36.]

There is more. Harara also lied about his use of messaging platforms. He testified at his March 25 deposition that he last used Signal "I don't know. Probably yesterday or the day before maybe." [Ex. S (3/25/26 Harara Dep. Tr.) at 189:18-21.] He offered that testimony between 1:50 and 2:35 p.m. [*Id.* at 160:17, 195:15.] It was false. On July 31, Harara produced documents reflecting that he actively used Signal that very day, even discussing the deposition on Signal as it was occurring. He had a group call via Signal ending at 7:59 a.m. that morning; sent messages via Signal at 7:44 a.m., 9:23 a.m., and 10:40 a.m. [Ex. U (DEFS0505–0510).] He sent the final message during his deposition. Additionally, he received multiple Signal messages during that timeframe, many of which appear to have been deleted by the senders. [*Id.*] And as explained below, Harara activated Signal's auto-delete function that day to ensure that any further messages would vanish after eight hours. Yet he testified that day that his messaging apps were not set to auto-delete content. [Ex. S (3/25/26 Harara Dep. Tr.) at 216:11–217:2.]

Finally, Harara offered false testimony about his tax filings. He testified that he believed that he'd filed tax returns in 2024 individually and for his business. [*Id.* at 140:17–142:12.] But after the Court ordered him to produce tax returns [Dkt. 143], Harara produced none and instead declared under penalty of perjury that he has "not filed state or federal tax returns since opening the Jerusalem Coffee Shop" in fall 2023. [Ex. II (8/19/26 Harara Decl.) ¶ 2; Meuti Decl. ¶ 45.]

### *2. Harara has intentionally destroyed responsive communications.*

Harara also has destroyed relevant, responsive communications. A post that he placed on X is one example. Harara reposted to his X account bearing the "Bay Area" screen name a November 2, 2024 post calling Jonathan Hirsch "genocidal, bottom dwelling Zionist scum." [Ex. P.] During a January 9, 2026 meet-and-confer call, Harara's prior counsel claimed that Harara had no responsive social-media posts, so

Plaintiff's counsel read him the text of that post. [Meuti Decl. ¶ 46.] A January 15, 2026 PageVault capture of Harara's X account shows that the post had disappeared from Harara's feed. [Meuti Decl. ¶ 48; Ex. Q (1/15/26 PageVault capture).] At his deposition, Harara could not identify any reason that the post would have disappeared other than a collection error. [Ex. T (3/27/2026 Dep. Tr.) at 401:2-24, 406:9–410:24.] PageVault, of course, displays everything that appears as of the capture date as well as a cover page showing the document title, URL link, and access and capture timestamps. *See Multiple Energy Techs., LLC v. Casden*, Case No. 2:21-cv-01149-(ODW) (RAOx), 2025 U.S. Dist. LEXIS 156065 at *7 (C.D. Cal. June 4, 2025) (finding PageVault screenshots to be sufficiently authenticated). The only reason that post could have disappeared is if someone made it disappear. Notably, after Plaintiff's counsel raised the spoliation with Harara's counsel, the post reappeared briefly. [Meuti Decl. ¶ 49.] But it evidently disappeared again. On August 7, Harara produced his X feed, but the produced document reflects that the November 2, 2024 "Zionist scum" tweet had been taken down. [Ex. P at DEFS6078–6081.] It did not appear on his feed today, the date that this Supplemental Brief was filed. [Meuti Delc. ¶67.]

As noted above, Harara also intentionally destroyed electronic communications sent during his deposition. After arriving 45 minutes late, Harara was texting at the deposition table during a break. [Meuti Decl. ¶ 53.] Counsel asked him on the record to identify to whom he had texted the deposition's Zoom link, Harara feigned ignorance, and shortly after 10:45 a.m. that day counsel requested that the transcript be produced. [Ex. S (Harara 3/25/26 Dep. Tr.) at 65:16–67:24.] Harara did not produce those threads until July 31; Harara used the Signal messaging platform for one thread. [Ex. U.] (That document is the only Signal thread that Defendants have produced.) The produced documents reflect that (a) two participants deleted at least 12 messages, and (b) sometime after 10:42 a.m., Harara himself "set disappearing message time to 8 hours"—meaning that he set the platform to delete the messages later that day. [*Id.* at DEFS0508–510.] As a result, no further messages on that thread appear.

***3. Harara has obstructed discovery by hiding responsive text messages.***

Harara has worked hard to avoid producing relevant text messages. Indeed, he structured his text productions to conceal more than they revealed.

On August 28, 2025, Plaintiff served his first set of RFPs. [Ex. A (RFPs).] The RFPs to Harara

sought "All Documents and Communications" concerning various topics, including Harara's interaction with Jonathan Hirsch (RFP #2); the Iced In Tea Fada menu item (RFP #7); the "Sweet Sinwar" menu item (RFP #8); versions of the JCH menu (RFP #9); and Harara's social-media posts (RFP #11); among others.

The table below reflects the dates of his various productions of text messages and descriptions of the productions. Each production came in a single PDF file containing portions of various text threads.

| **Date** | **Bates Beg** | **Bates End** | **Description / Format** |
|---|---|---|---|
| 1/16/2026 | DEFS0284 | DEFS0290 | Text exchange with Nate re: café exterior wall / iPhone full screengrabs |
| 1/28/2026 | DEFS0299 | DEFS0347 | Some iPhone search screen grabs, some full iPhone screengrabs |
| 3/10/2026 | DEFS0348 | DEFS0375 | "New Discovery" / full iPhone screengrabs |
| 4/17/2026 | DEFS0487 | DEFS0504 | "Final Discovery"; originally produced w/o Bates; received w/ Bates 6/24 / full iPhone screengrabs |
| 6/24/2026 | DEFS0376 | DEFS0477 | "June discovery" / iPad screengrabs |
| 7/31/2026 | DEFS0505 | DEFS0510 | Signal messages during deposition / iPhone screengrabs |
| 7/31/2026 | DEFS0539 | DEFS0542 | Text exchange with Nora during deposition / iPhone screengrabs |
| 8/7/2026 | DEFS2125 | DEFS2164 | Labeled "6.24.26 Production Errors w/ Corrections" / iPad screengrabs |

[Meuti Decl. ¶ 27.] The gray-shaded rows post-date June 12, when fact discovery closed.

The productions preceding Harara's March 25 and March 27 depositions were incomplete. He testified to his selection process: he ran keyword searches in his iMessage app, took screenshots of either the search results or portions of text threads, and deliberately omitted texts that Plaintiff's counsel "probably don't need." [Ex. T (Harara 3/27/2026 Dep. Tr.) at 378:4-16.] He also testified that because he chose to take screenshots of search results, rather than of the text-conversation threads, at least 81 text messages were produced without any adjacent messages from the relevant threads. [*Id.* at 377:19–392:8.]

Later-produced versions of those text messages show that in selecting what to include in screenshots and what to crop out, Harara aimed to withhold inculpatory messages. Examples abound.

Consider his exchange with "Ali Muslim Legal Fund." He first produced a snippet of that text on January 28. [Ex. V at DEFS0331.] In June (after his current counsel joined the case), he produced a one-page screenshot omitting both preceding and subsequent texts. [*Id.* at DEFS0453.] Both appear below.







Not until August—over four months after Harara's deposition and nearly two months after discovery closed—did Harara produce the complete exchange, which showed that he'd sent three videos from the Jonathan Hirsch incident. [*Id.* at DEFS2148–2149.] Harara had not produced those responsive videos, and did not produce them until September 1. Most charitably, those videos are unflattering for Harara.

Or consider his exchange with "Salina." Harara did not produce that one with his original January production. In March, he produced only a single undated screenshot of the exchange, showing that he had sent an article about the café's menu. [Ex. W at DEFS0363.] Harara elected to crop out of that screenshot both the preceding text messages and responses. [*Id.*] His June production contained a version revealing some additional messages at the end of that thread. [*Id.* at DEFS0399–400.] But in August, he finally produced the preceding message, which contains a screenshot of a post (evidently to X/Twitter) regarding JCH's menu items that Harara sent to Salina. [*Id.* at DEFS2130–2132.] That post described the café's then-new menu as "an Oct. 7 celebration menu" and noted that JCH had held an event on the October 7 anniversary "to honor Muslim 'martyrs.'" [*Id.* at DEFS2130.] It is not difficult to see why Harara chose to withhold those texts until four months after his deposition and two months after discovery closed.

Harara's exchange with "Superskills" offers another example. In January, he produced a snippet

of the thread, in which Harara described his motivation for ejecting Jonathan Hirsch: "There's nothing wrong with kicking ppl out if they refuse to admit to Zionism." [Ex. X at DEFS0308.] That snippet cropped out both the counterparty's identity and the date and time of the exchange. In June, after his deposition and after discovery closed, Harara produced a screenshot showing more of the exchange, including a text from "Superskills" advising Harara that as an American businessperson, he "can't kick somebody out for being a Zionist unless they were making an actual disturbance." [*Id.* at DEFS0423.] That screenshot picks up in the midst of the conversation; the bottom of a blue quote bubble appears at the top of the screenshot, which makes plain that Harara had cropped out a preceding message that he sent that day. Not until August did Harara disclose additional messages from the thread, including a video that Harara sent (which he still hasn't produced) and a text from "Superskills" advising Harara to release footage showing Hirsch's allegedly disruptive behavior. [*Id.* at DEFS2138–2141.]

The exchange with a phone number ending in -2118 underscores that Harara strained to withhold portions of text messages that he feared would harm his defense. In January, Harara produced only snippets of that exchange:







[Ex. Y at DEFS0303, 0323]. In March, he produced a single screenshot, omitting context. [*Id.* at DEFS0351.] In June—after he changed counsel and after discovery closed—Harara produced more of the exchange. DEFS0384–85 contains two iPad screenshots of the exchange, reflecting that Harara sent two articles—one appearing at the bottom of the first page and the other appearing at the very top of the second. He cropped the screenshots to reflect that no intervening messages punctuated the thread between those two articles. Manipulating the screenshots that way cropped out a key part of the exchange. [*Id.* at DEFS0384-0385.] Harara's counterparty, in response to the article titled, "Oakland café ousts man over religious symbol on baseball hat," texted, "Yahud?"—Arabic for "Jew?" [*Id.* at 2128.] Withholding the full exchange before his deposition precluded counsel from asking Harara about it.

***4. Harara withheld, until two months after discovery closed, social-media messages reflecting animus against Jewish people.***

The 6134 Bates-labeled pages and 2474 native files that Harara produced on or after August 7 include inflammatory documents that Harara willfully withheld until after discovery closed. These documents suggest what may exist in the sources of data that Harara still has not searched.

For example, a January 3, 2025 JCH Instagram post shows JCH advertising for sale a t-shirt featuring the Jerusalem Coffee House name ringed by flags with the emblem of Hamas, a designated terrorist organization dedicated to violence against Jews and Israelis. [Ex. Z at DEFS2037–2038.]

His Instagram direct-messages contain both antisemitic tropes and antisemitic slurs. For instance, an exchange with someone called "4YEO" includes Harara saying, "You know when I was there I'd throw Pennies on the ground as [Jewish people] walk by lol." [Ex. KK at DEFS2285.] An exchange with "thechubbstory" includes Harara sending an attachment reading, "Let me make it clear. All the a**** in the music industries and holywired [i.e., Hollywood] are individual Jews." [Ex. BB at DEFS5841–42.] Another exchange reflects him referring to Jews as "little hats," which he and his counterparty said was their "code word." [Ex. CC at DEFS4456.]

***5. Harara continues to withhold evidence and refuses to follow counsel's instructions.***

At the August 31 Discovery Conference, the Court ordered Plaintiff to identify the deficiencies remaining after Defendants' August 7 and August 28 productions. Plaintiff sent a letter on September 4 identifying high-priority outstanding deficiencies including:

- Responsive documents from numerous sources that evidently have not yet been searched—three email accounts, a Twitter/X account, a Facebook account, a SnapChat account, two financial accounts (JCH's Venmo and CashApp accounts), and accounts on five messaging platforms (Signal, Discord, Telegram, WhatsApp, and WeChat).
- Complete financial documents—the documents produced on September 1 have pages that are removed or obscured.
- Missing custodial business data, including iterative versions and drafts of the café's menu.
- Copies of hard-copy documents that Mr. Harara testified at his deposition that he had collected and compiled to be produced in discovery.
- 18 specific iMessage text threads that remain incomplete after multiple re-productions.

[Ex. DD (9/4/26 Meuti Ltr.) at 1–5.] Also, Plaintiff still awaits confirmation that all relevant photos and videos stored on Defendants' cloud-storage accounts have been produced; that all social-media posts related to Jonathan Hirsch have been produced; and that the searches run on Defendants' data included English transliterations of Arabic words (e.g., "Yahood" or "Yahud"), as previously agreed. [*Id.* at 5–6.]

The parties met and conferred on September 11, and Defendants' counsel said that the attorney/client relationship had deteriorated, denying him the ability to substantively address the issues in the September 4 letter or commit to producing any missing documents. [Meuti Decl. ¶ 65.] His subsequent motion to withdraw reflects that despite counsel's admonitions to produce responsive ESI, Harara remains defiant. [Dkt. 182 at 4.]

**C. Plaintiff has suffered prejudice from Harara's abuse of the judicial process.**

***1. Harara's obstruction has delayed resolution of this case.***

This should be a straightforward case. Accordingly, the initial case-management plan called for fact discovery to end on February 28 and for trial to commence on July 20. [Dkt. 52.] Harara's gamesmanship in discovery forced the discovery cutoff to move twice—first to May 1 and then to June 12. [Dkt. 80 & 120.] His abuse of the discovery process also required a three-month delay for the trial, which is now set to begin October 26, although Harara's continued disregard for his discovery obligations now threatens that date, as well. [*See* Dkt. 182 (Wallace Mot. to Withdraw).]

***2. Harara's tactics have hampered Plaintiff's preparation for trial.***

Plaintiff's counsel have had to scramble to prepare for trial because the overwhelming majority of discovery that Defendants have provided came well after discovery closed. Indeed, of the 6676 Bates-labeled pages that Harara has produced, 6134 of them (91.9%) were produced on or after August 7.[5] That delay not only strains counsel's trial preparation, but also denied Plaintiff the opportunity to depose Harara over those documents. Instead, much of the on-the-record time at Harara's deposition was spent addressing the process by which he collected and reviewed documents. Harara's delay also thwarted further discovery flowing from the contents of these documents, including subpoenaing other potential

[5] During that period Defendants produced another 2474 native files that are not Bates-labeled. [Meuti Decl. ¶ 28.]

witnesses or third-party records.

Further, Defendants' productions remain incomplete. [*See supra* Pts. III.A.1.–3. & III.B.5.] Plaintiff thus must prepare for trial with a record full of untruths, withheld documents, and obscured facts. In these circumstances, it is impossible "for the Court to be confident that the parties will ever have access to the true facts." *Yu v. ByteDance Inc.*, 759 F. Supp. 3d 993, 999 (N.D. Cal 2024) (citation altered).

***3. Harara's tactics have caused Plaintiff's counsel to spend hundreds of hours addressing Harara's failure to meaningfully participate in discovery.***

Plaintiff's efforts to address Defendants' discovery abuse began on December 1, 2025, and have continued for nearly ten months. Attorneys at the Benesch firm have spent at least 171 hours, and ADL attorneys another 73.6 hours seeking to rectify Harara's discovery abuses. *See infra* Pt. III.D.3.

**D. The Court should sanction Defendants.**

In light of the abuses outlined above, there is little question whether the Court should sanction Harara. It should. And because Harara's conduct represents the most-severe willful obstruction and abuse of the judicial process, the most-severe sanction is appropriate here.

***1. Terminating sanctions are appropriate.***

As both this Court and the Ninth Circuit have recognized, "In deciding whether to impose case-dispositive sanctions, the most critical factor is not merely delay or docket management concerns, but truth." *Yu v. ByteDance Inc.*, 759 F.Supp.3d 993, 999 (N.D. Cal 2024) (Illston, J.) (quoting *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007)). And as outlined above, Harara's history of dishonest conduct and refusing to obey Court orders have undermined the search for truth. It is thus no wonder that this case satisfies all five factors that courts consider when contemplating terminating sanctions.

**<u>Expeditious resolution & docket management (Factors 1 and 2).</u>** Courts recognize that these factors favor terminating sanctions, and especially when a court is "subject to" a litigant's "endless vexatious noncompliance." *Harrison v. Whole Foods Mkt., Inc.*, No. 20-cv-04867-JSW (TSH), 2026 U.S. Dist. LEXIS 142351 *39 (N.D. Cal. Apr. 28, 2026) (citations omitted).

That is the case here. Harara's tactics have impeded an orderly path to trial, making docket management nearly impossible. They have forced two discovery extensions—and then spurred 2.5

months of a post-cutoff discovery do-over under Magistrate Judge Hixson's supervision. Even those efforts have backfired, as Harara has refused to meet the deadlines that Magistrate Judge Hixson has set. [*Supra* Pts. III.A.1.–4. & III.B.5.] Harara's delay tactics have also pushed the trial date once and threaten to do so again. Without terminating sanctions, the case threatens to drag out further.

**Prejudice to the party seeking sanctions (Factor 3).** This factor weighs heavily in favor of sanctions. Plaintiff has already suffered significant prejudice from Harara's tactics. [*Supra* Pt. III.C.] Withholding terminating sanctions would cause further prejudice by forcing him to proceed to trial on an incomplete record. And that would effectively reward Harara's bad-faith conduct. Further, this Court's precedent establishes that "repeated failure to comply with court orders constitutes adequate prejudice … to justify the imposition of terminating sanctions." *Elecs. for Imaging, Inc. v. Photoscript Grp., Ltd.*, 1999 U.S. Dist. LEXIS 7395 *9 (N.D. Cal. Sep. 14, 1999) (Illston, J.).

**Public policy seeking disposition on the merits (Factor 4).** This factor generally weighs against terminating sanctions, but not here. The Ninth Circuit recognizes that this factor "lends little support to a party whose responsibility it is to move a case toward disposition on the merits but whose conduct impedes progress in that direction." *Transamerica Life Ins. Co. v. Arutyunyan*, 93 F.4th 1136, 1147 (9th Cir. 2024) (cleaned up). As outlined above, Harara has worked to impede a disposition on the merits, and sadly, he has succeeded in precluding any realistic prospect of resolution on the case's true merits.

A default judgment against Harara is as close to a disposition on the merits as is possible. The Ninth Circuit recognizes that "it is appropriate to presume that where documents relevant to the merits of the litigation have been concealed the deception casts doubt on the concealing party's case." *Anheuser-Busch, Inc. v. Nat. Bev. Distribs.*, 69 F.3d 337, 354 (9th Cir. 1995) (affirming terminating sanctions).

**Availability of lesser sanctions (Factor 5):** This factor is, at best, neutral and poses no obstacle to terminating sanctions here. When applying this factor, courts consider whether the recalcitrant party has been warned that case-ending sanctions were possible. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). That said, "an explicit warning is not always necessary." *Anheuser-Busch*, 69 F.3d at 353. And the Ninth Circuit affirms terminating-sanction awards when, as here, a party's "pattern of deception and discovery abuse ma[k]e it impossible for the district court to conduct [a] trial with any reasonable assurance that the truth would be available." *Id.* at 352.

Awarding terminating sanctions is especially appropriate here. When "the court anticipates continued deceptive misconduct," it should "reject lesser sanctions." *Id.* Here, Harara has offered no reason to believe that his pattern of deceptive misconduct will cease. Even after the Court referred discovery proceedings to Magistrate Judge Hixson to give Harara a last chance to comply with his discovery obligations, he persisted in obfuscating the record to the point where his counsel feels compelled to withdraw and the Court has determined that further attempts to compel discovery compliance would be futile. [Ex. H (9/15/26 Disc. Conf. Tr.) at 6:11-17.] Harara's recalcitrance has worn down two sets of lawyers and shows no signs of abating. No lesser sanction would serve the ends of justice.

Both *Yu* and *Harrison* show as much. Harara's abuse of the judicial process resembles the conduct at issue in those cases. In both, the sanctioned party's conduct robbed the Court of "confiden[ce] that the parties will ever have access to the true facts." *Yu*, 759 F. Supp. 3d at 1001 (citation omitted); *Harrison*, 2026 U.S. Dist. LEXIS 142351 at *45 (concluding that the fifth factor supported dismissal because the Court lacked "any reasonable assurance that the truth will be available"). In *Yu*, the driving factor was the plaintiff's fabricated evidence and false sworn statements. In *Harrison*, it was the plaintiff's "pattern of deception and discovery abuse." *Id.* Like those parties, Harara has worked to deceive Plaintiff and the Court with his false declaration and false testimony. Where *Yu* fabricated evidence, Harara has destroyed it, withheld it, and lied about it. Both approaches equally corrupt the search for truth. As in those cases, terminating sanctions are necessary because Harara has made a trial on the true merits impossible.

***2. In the alternative, the Court should enter evidentiary sanctions from Harara's bad-faith abuses of the discovery process.***

If, however, the Court is not convinced that terminating sanctions are appropriate here, it should enter evidentiary sanctions.[6] When a party has violated a discovery order, Rule 37(b)(2)(A)(i) permits the Court to "direct[] that matters embraced in the order or other designated facts be taken as established for purposes of the action." Courts in the Ninth Circuit have found that "evidentiary sanctions deeming facts alleged in the complaint established for trial, subject to rebuttal by the non-moving party, where the moving party was prejudiced because of the other party's discovery abuses." *AECOM Energy & Constr.,*

[6] Plaintiff already moved to deem his Second Set of Requests for Admission as admitted. [Dkt. 122]. The Court should grant that motion as well.

*Inc v. Topolewski*, 2022 WL 595937, *6 (C.D. Cal. Feb. 25, 2022) (cleaned up). In that circumstance, evidentiary sanctions are necessary to prevent prejudice to one party due to the other's failure to comply with its discovery obligations. *Choudhuri v. Wells Fargo Bank, NA*, 2017 WL 5598685, *9 (N.D. Cal. Nov. 21, 2019). This Court recognizes that when, as here, a party fails to obey a discovery order "the court may issue orders that include prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters into evidence." *Harrison v. Whole Foods Mkt., Inc.*, 2026 U.S. Dist. LEXIS 142351 (N.D. Cal. April 28, 2026) (Hixson, J.) (cleaned up).

As outlined above, Defendants have violated a cascade of discovery orders. The results of that serial disobedience include withholding over 90% of the produced documents until well after discovery closed, and continuing to withhold evidence to this day. If the Court denies terminating sanctions, it should enter evidentiary sanctions including deeming the following facts established for purposes of trial:

- that Harara harbors anti-Jewish animus;
- that Harara's anti-Jewish animus drove his behavior toward Mr. Radice and Mr. Hirsch;
- that the documents that Harara willfully refused to timely provide to his counsel for production reflect his anti-Jewish animus and contain admissions that he and JCH refused service to would-be patrons because they were Jewish, including Radice and Hirsch;
- that Harara willfully withheld responsive evidence before his deposition and before the discovery cutoff to prevent Plaintiff from discovering inculpatory evidence.

Additionally, the Court should bar Defendants from using at trial any evidence that they failed to produce before the June 12 discovery cutoff. Those evidentiary sanctions are necessary to ensure that Defendants do not benefit from their willful disregard for the Court's orders and their ongoing catch-me-if-you-can approach to discovery.

***3. The Court must also award a monetary sanction.***

Rule 37's text makes a monetary sanction mandatory—the Court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure" to comply with discovery orders. Fed. R. Civ. P. 37(b)(2)(C). The only exception is if "the failure was substantially justified or other circumstances make an award of expenses unjust." *Id.* Defendants requested and received an opportunity to brief the good-cause issue [Dkt. 164], but they failed

to establish good cause [*see* Dkt. 168]. Further, Defendants' counsel's recent motion to withdraw confirms that Harara lacks any good cause for his abuses of the discovery process; instead, the cause was Harara's willful disdain for the judicial process. [Dkt. 182.] Monetary sanctions are mandatory.

Courts use the lodestar figure—the reasonable hours expended multiplied by a reasonable rate in the relevant community—to determine reasonable attorneys' fees. *Valjakka v. Netflix, Inc.*, 2025 WL 2118085 at *2 (N.D. Cal. Nov. 19, 2025). "The lodestar figure is presumptively reasonable." *Id.* To determine the reasonable hourly rate, courts consider the experience, skill, and reputation of the attorneys requesting fees, as well as "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Id.* Here, as referenced below, the rates of Mr. Radice's attorneys are reasonable given the skill, experience and reputation of the lawyers and because the rates are based on prevailing rates in the Midwest, which are lower than those in the Bay Area. It is permissible for courts to order both terminating sanctions as well as reasonable attorneys' fees and costs. *See, e.g., In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2024 WL 4823938 at *23 (N.D. Cal. Nov. 15, 2024).

The rates identified for the lawyers representing Plaintiff in this case are reasonable. The Benesch attorneys' usual and customary rates range from $850 to $855 for partners and $395 to $645 for associates. [Meuti Decl. ¶69.] Other timekeeper rates are $430 for a highly experienced paralegal and $350 for a summer associate. [*Id.*] Over ten years ago, this Court found that in the Bay Area, "reasonable hourly rates for partners range from $560 to $800, for associates from $285 to $510, and for paralegals and litigation support staff from $150 to $240." *In re Magsafe Apple Power Adapter Litig.*, No. 5:09-CV-01911-EJD, 2015 WL 428105, at *12 (N.D. Cal. Jan. 30, 2015). In the intervening decade, attorneys' rates have increased substantially. The usual and customary rates that the Benesch attorneys charge are well within the reasonable range for work performed in the Bay Area in 2026.

The table below depicts the hourly rate and time spent by the Benesch timekeepers in addressing Harara's misconduct.

| **Name** | **Hourly Rate** | **Position** |
|---|---|---|
| Michael D. Meuti | $855 | Partner |
| Michael J. Montgomery | $850 | Partner |

| Name | Hourly Rate | Position |
|---|---|---|
| David M. Hopkins | $645 | Senior Managing Associate |
| Peter J. Sullivan | $550 | Managing Associate |
| Meghan K. Golden | $525 | Associate |
| Robert F. Read | $395 | Associate |
| Sydni L. Porter | $395 | Associate |
| Maggie McNea | $395 | Law Clerk |
| Victoria V. Ter Bush | $430 | Paralegal |
| Kyra P. George | $350 | Summer Associate |
| Michele L. Schmitt | $345 | Paralegal |

[Meuti Decl. ¶69.]

The rates identified for the ADL lawyers are reasonable as well. The rates requested for ADL attorneys working on this matter range from $360 per hour for a law clerk to $850 per hour for a lawyer with seniority and credentials comparable to a partner at a commercial law firm. [Larimer Decl. ¶¶ 9–12.] As noted above, the Court held a decade ago that comparable rates were reasonable in *In re Magsafe*. They are all the more reasonable today.

The hours spent by both sets of lawyers on this matter are reasonable. The attached declarations show that, conservatively, Plaintiff's lawyers spent 244.6 hours addressing Harara's misconduct. [Meuti Decl. ¶¶ 82–85; Larimer Decl. ¶¶ 13–16.] This motion addresses a yearlong campaign to obscure the truth and to prevent Plaintiff from gaining access to documents that would reveal it. That campaign includes Harara's misleading his attorneys about what his ESI would reveal, denying them access to it, submitting a false declaration to the Court about his discovery efforts, and testifying falsely at his deposition regarding both his discovery efforts and the case's underlying merits. Addressing that campaign required participating in at least 11 meet-and-confer videoconferences [Meuti Decl. ¶¶ 6–7 & 20–22], drafting and revising three joint discovery dispute statements [Dkt. 68, 96, & 172], drafting and revising a motion to compel and a motion for sanctions [Dkt. 115 & 124], drafting and revising an additional motion regarding

missed discovery deadlines [Dkt. 122], and participating in five discovery conferences with the Court [Meuti Decl. ¶ 22.]

Applying the lodestar calculation, the Court should sanction Defendants in the amount of $166,500.50. At the Benesch attorneys' standard rates, which clients routinely pay for these attorneys' services, the total fees associated with the 171 hours that Benesch attorneys spent on tasks necessary to address Defendants' discovery abuse is $115,407.50:

| Timekeeper | Hourly Rate | Hours Spent | Total Fees |
|---|---|---|---|
| Michael D. Meuti | $855 | 55.00 | **$47,025.00** |
| David M. Hopkins | $645 | 46.60 | **$30,057.00** |
| Michael Montgomery | $850 | 16.80 | **$14,280.00** |
| Peter J. Sullivan, Jr. | $550 | 15.4 | **$8,470.00** |
| Meghan K. Golden | $525 | 8.00 | **$4,200.00** |
| Sydni L. Porter | $395 | 8.50 | **$3,357.50** |
| Kyra P. George | $350 | 7.80 | **$2,730.00** |
| Victoria V. Ter Bush | $430 | 5.50 | **$2,365.00** |
| Robert Read | $395 | 5.20 | **$2,054.00** |
| Maggie McNea | $395 | 2.20 | **$869.00** |
| **TOTAL** | | | **$115,407.50** |

[Meuti Decl. ¶ 85.]

Likewise, at the reasonable hourly rates for the ADL timekeepers identified below and in paragraphs 9–12 of the Larimer Declaration, the 73.6 hours that they spent on those tasks amounts to $51,093 worth of legal work.

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| Corena Larimer | 51.2 | $800 | **$40,960** |
| James Pasch | 3.9 | $850 | **$3,315** |

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| Brendan Hogan | 7.9 | $380 | **$3,002** |
| Carola Aisenberg | 10.6 | $360 | **$3,816** |
| **TOTAL** | **73.6** | | **$51,093** |

The Court should accordingly impose monetary sanctions of $166,500.50 against Defendants.

## IV. CONCLUSION

Abdulrahim Harara, the sole proprietor of the two entity Defendants and a Defendant himself, has turned discovery in this straightforward case into a circus. He has withheld evidence, and then lied under oath about the evidence that he withheld. He destroyed evidence and lied about that, too. And when the Court gave him an opportunity to rectify some of his prior noncompliance, he willfully disregarded the Court's orders. None of this conduct was an accident. It was all by design.

Harara's repeated decisions to evade his obligations have debased the search for truth. Trial is just a month away, and because of Harara's conduct, it cannot proceed on a complete and truthful evidentiary record because of Harara's conduct.

In these circumstances, only one sanction can match the gravity of Harara's abuse of the judicial process: Terminating sanctions in the form of a default judgment against all three Defendants.

Respectfully submitted,

Dated: September 23, 2026

*/s/ Michael D. Meuti*
MICHAEL D. MEUTI (CA 227939)
BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216-363-4500
mmeuti@beneschlaw.com

*Attorney for Plaintiff Michael Radice*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 23rd day of September 2026, the foregoing document was served on Defendants' counsel of record through the Court's CM/ECF system.

Dated: September 23, 2026

Respectfully submitted,

*/s/ Michael D. Meuti*

MICHAEL D. MEUTI (CA 227939)
BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216-363-4500
mmeuti@beneschlaw.com

*Attorney for Plaintiff Michael Radice*